THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CHARLES WASHINGTON, Defendant-Appellant.

First District (Third Division)   No. 1—85—3110

Opinion filed April 12, 1989.

Robert K. Mayer, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., and Nancy Black, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Defendant, Charles Washington, was found guilty, by a jury, for the murder of his brother-in-law Nathan Bottley. He was sentenced to serve 28 years in prison. This court reversed and remanded the case,

holding that defendant was denied effective assistance of counsel. (*People v. Washington* (1982), 111 Ill. App. 3d 711, 444 N.E.2d 753.) This court's decision was affirmed by the Illinois Supreme Court. *People v. Washington* (1984), 101 Ill. 2d 104, 461 N.E.2d 393.

Following a second jury trial, defendant was found guilty of murder and sentenced to serve 25 years in prison. On appeal defendant contends that (1) the trial court erred in denying his motion to suppress an oral statement; (2) the State violated the rules of discovery by failing to notify defendant of its rebuttal witnesses; (3) the State violated rules of discovery by failure to reveal the substance of defendant's oral statement and witnesses thereto; (4) the trial court erred in denying defendant's motion to suppress the lineup identification; (5) the verdict was against the manifest weight of the evidence and should be reversed; (6) the trial court erred in refusing to permit defense counsel to cross-examine a witness and introduce evidence; and (7) the cumulative abuse by the prosecutors and police denied defendant his right to a fair trial. We affirm.

Jimmy Moore testified for the State. Moore stated that on May 7, 1979, at approximately 6:45 a.m., he arrived for work at the Canfield Bottling Company garage located at 111 East 89th Street in Chicago. Moore testified that after he checked into the office, he opened the overhead door to the garage and proceeded to check his truck to make sure that it was properly stocked. At about 7 a.m., Moore observed the victim pass by and walk in the direction of the office. Moore stated that soon thereafter, he heard a noise, turned, and saw the back of a man standing with a gun in his hand. The man was holding the gun with the barrel facing the ground. Moore testified that he observed the man fire the gun twice from a distance of approximately 18 feet. Moore observed the man's face as he turned and exited the garage. Moore stated that he climbed down from his truck, walked to the spot where the shots were fired and observed the victim lying on the ground. Moore testified that he returned to the office and reported the shooting. Moore identified defendant in a lineup and in court as the person who fired gunshots in the Canfield garage on the morning of May 7, 1979.

Ivory Jenkins, district manager for Canfield, also testified on behalf of the State. Jenkins testified that he arrived for work at the 89th Street garage at approximately 6:30 a.m. on May 7, 1979. He stated that at about 7 a.m., while he was standing outside the office talking with one of the drivers, he heard a gunshot. Jenkins testified that he looked in the direction of the sound and observed a man run out of the rear garage door. He ran over to see what was happening and observed

Nathan Bottley lying on the ground. Jenkins stated that he watched the man run westbound on 89th Street. After the man exited the garage, Jenkins got into his car and followed him. He stated that as he approached 89th and State Street, he saw the man who ran from the garage get on a northbound State Street bus. Jenkins followed the bus to 73rd and State Street. When he reached 71st Street, he flagged down a police car. However, when the police stopped the bus, the man who Jenkins was following was no longer on board. Although Jenkins never saw the offender's face, he observed his body from the rear and described him as approximately 5 feet 3 to 6 inches tall, with a small build and "corn rolled" hair.

Marla Granberry testified for the State and related that on May 7, 1979, she lived on the corner of 89th Street and Michigan Avenue in Chicago. She further testified that at about 7 a.m. on that date she was in the second-floor bathroom of her home when she heard a gunshot. Granberry looked out her window which faces 89th Street and observed a man with a gun chasing another man down the middle of the street. She described the man with the gun as shorter and smaller than the man being chased. Granberry further stated that the man being chased was wearing a brown Canfield's uniform. She stated that the gunman had "corn rolls" in his hair and that he chased the other man into the open door of the Canfield company garage. Granberry heard three shots fired and observed a man exit the garage and run westbound on 89th Street. Granberry then called the police. Granberry later identified the defendant in a lineup and at trial as the man she observed chasing a man down 89th Street at gunpoint on May 7, 1979.

Chicago police detective Frank Laverty was called by the State and testified that he was assigned to investigate the murder of Nathan Bottley. Laverty stated that he and another detective arrested defendant and placed him in a lineup. He stated that both Jimmie Moore and Marla Granberry positively identified the defendant in the lineup.

The defendant's first witness was Percy Green. Green testified that on May 7, 1979, at approximately 7 a.m., he was parking his car near the 89th and State Street offices of the Illinois Bell Telephone Company where he worked. He stated that as he parked he heard a noise that sounded like a backfire. Green testified that he saw a man running down 89th Street from the direction of Canfield's. He stated that the man almost ran into his car and that he noted that he was wearing a beige jogging suit and had braided hair and a full beard. Green later went to Canfield's garage and spoke with the police. The officers showed him a photo array which included defendant's picture, but he was unable to identify anyone. Green testified that he could

identify the beard and hairstyle, but not the face of the person who ran into his car.

Defendant also called his family minister, Reverend E.N. Williams; his mother, Ethel Washington; his father, James Washington; his wife, Phyllis Washington; and his sisters Juanita Washington and Adellar Laye to testify on his behalf. His mother, father, wife and sister Adellar Laye all placed defendant in the family home, located in Chicago Heights, between the hours of 6:45 and 7:25 a.m. on May 7, 1979. All of defendant's family members and Reverend Williams also testified that defendant's hair was not braided on that date. In addition, defendant's wife Phyllis testified that she and defendant left home together at approximately 7:30 a.m. that day to go job hunting.

The prior testimony of Effie Manson, who was deceased at the time of the second trial, was read to the jury by a court reporter. Manson previously testified that on May 7, 1979, she lived next door to the Washington family and that at about 7:15 a.m. she was on her front porch when she saw defendant and his father exit their home. She stated that defendant and his father switched the position of their cars in the driveway and defendant returned to the house. She further testified that defendant and his wife left the house at approximately 7:30 a.m. and drove away in their car.

Defendant testified on his own behalf. He stated that he awoke at approximately 7 a.m. on May 7, 1979, when his father asked him to move his car. Defendant testified that he moved his car and returned to the house. Defendant stated that he left home with his wife at approximately 7:30 a.m. He testified that they went job hunting at Simtron in Crete-Monee and United States Steel and Inland Steel in Gary, Indiana.

During cross-examination, the State attempted to question defendant regarding statements he made to Detective Laverty and Assistant State's Attorney Terry Hake following his arrest on May 17, 1979. Defense counsel objected and requested a sidebar. During the colloquy out of the jury's presence, defense counsel told the court that he was surprised by the introduction of an oral statement made by defendant and that the felony review memo which summarized the statement was never tendered pursuant to discovery. The State's Attorney responded that the memo had been tendered and that the answer to discovery also referred to the statement. The court noted that the police report contained a summary of defendant's exculpatory statement. Defense counsel made an oral motion to suppress the statement. The court noted that it had previously heard and denied motions to quash arrest and suppress identification. It ruled that the motion was untimely and

that the statement would be admissible for impeachment purposes.

During further cross-examination, defendant testified that on May 17, 1979, he made a statement to Laverty in which he stated that his hair was not cornrowed on May 7, 1979, and that he was out looking for a job at 7 a.m. that day. However, he denied that he told Laverty that everyone in his home was asleep on that day. Defendant would neither admit nor deny that he told the detective that he could not recall the places he went on his job search.

Following rebuttal testimony and denial of defendant's motion for a directed verdict, the jury returned a verdict of guilty of murder. The court subsequently sentenced defendant to 25 years in prison. This appeal followed.

Defendant first argues that his oral statement made to police officers was involuntarily obtained and that his motion to suppress, which was made during trial, should have been granted. We disagree.

■ Section 114—11(g) of the Code of Criminal Procedures of 1963 requires that motions to suppress the voluntariness of a confession "shall be made before trial unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion. If the motion is made during trial, and the court determines that the motion is not untimely, ***" the court may then hear the motion. (Ill. Rev. Stat. 1987, ch. 38, par. 114—11(g).) Where the defense was aware of grounds prior to trial, and had time and opportunity to make the motion, the trial court's denial of an untimely motion will be upheld. (*People v. Fernandez* (1987), 162 Ill. App. 3d 981, 986, 516 N.E.2d 366, 369.) Further, where the defendant's statement is contained in the police report which was tendered prior to trial as a part of discovery, defendant will be deemed properly notified of the possible grounds for the motion. *People v. Torres* (1981), 93 Ill. App. 3d 718, 720, 417 N.E.2d 728, 730-31.

■ The State's answer to discovery which was filed on August 1, 1979, indicated that defendant made an oral statement which was summarized in the police report. Defendant acknowledged that he was in receipt of the State's answer to discovery and police reports. However, defendant never raised the issue of the voluntariness of his oral statement prior to trial. Defendant raised the issue for the first time at trial by way of an oral motion to suppress the statement made during the State's cross-examination of defendant. The court ruled that because counsel had a prior opportunity to bring the issue to the court's attention, and failed to do so, the motion would be denied. The court also noted that the defendant testified that he was given *Miranda* warnings prior to talking to the police. In light of the fact that defendant was

informed of the possible grounds for the motion through the State's answer to discovery and police reports provided over six years prior to trial, we conclude that the trial court did not abuse its discretion by denying defendant's untimely motion to suppress.

Defendant next argues that the State violated discovery rules by failing to include a list of rebuttal witnesses in its answer to discovery and that the violation mandates reversal and retrial. We disagree.

■ Supreme Court Rule 412 creates an affirmative duty on the part of the State to disclose its rebuttal witnesses to the accused. (107 Ill. 2d R. 412(a)(vi).) This duty to disclose attaches once the State has formed the intent to call the witness. (*People v. Hunter* (1984), 124 Ill. App. 3d 516, 536, 464 N.E.2d 659, 676.) Where a discovery violation occurs, defendant must demonstrate both that he preserved the issue for review by objecting at trial and that he was prejudiced by the violation. (*People v. Curtis* (1986), 141 Ill. App. 3d 827, 832, 491 N.E.2d 134, 138.) Further, exclusion of the evidence is a last resort, required only where a recess or continuance would be ineffective, and failure to seek a continuance waives the claim of error on appeal. 141 Ill. App. 3d at 833, 491 N.E.2d at 138.

■ In the present case, defendant did not make a request for a continuance or demonstrate that he was prejudiced by the testimony of the State's rebuttal witnesses. In addition, two of the State's rebuttal witnesses also testified in the case in chief and were listed in the answer to discovery. Moreover, it appears that defense counsel conducted a thorough cross-examination of the rebuttal witnesses. Under these circumstances, defendant was not prejudiced by the alleged nondisclosure of the State's rebuttal witnesses, and the trial court did not abuse its discretion by failing to exclude their testimony.

■ Defendant next argues that the State violated discovery rules by failing to provide him with the substance of his oral statement and a list of the witnesses to the statement. Supreme Court Rule 412 creates an affirmative duty on the part of the State to disclose "the substance of any oral statements made by the accused *** and a list of witnesses to the making *** of such statements." (107 Ill. 2d R. 412(a)(ii).) The purpose of the discovery rule is to provide the defense protection against surprise and unfairness, and to give defendant an opportunity to investigate the circumstances surrounding the making of a statement. (*People v. Birge* (1985), 137 Ill. App. 3d 781, 787, 485 N.E.2d 37, 43.) Noncompliance with the rules of discovery will not be reversible error absent a showing of prejudice. *People v. Scheidt* (1986), 142 Ill. App. 3d 844, 847, 492 N.E.2d 248, 251.

■ In the present case, the record reveals that the defendant was

notified of the substance of his statement through the State's answer to discovery and the police reports. The State also informed defendant during the trial of its intention to call Laverty to testify in rebuttal regarding the statement. Further, defendant was not prejudiced by any alleged failure to disclose witnesses to his statement where he knew that Laverty would be testifying at trial and had ample opportunity to interview him. We therefore conclude that the defendant's claim that he was prejudiced is unfounded.

Defendant next argues that the pretrial identification procedure was unconstitutionally suggestive because he was the only person in the lineup with braids in his hair. Defendant further argues that the trial court erred in denying his motion to suppress the resulting lineup and in-court identifications. We disagree.

■ Evidence of pretrial identifications of an accused by a witness must be excluded at trial only where (1) the procedure was unnecessarily suggestive and (2) there was a substantial likelihood of misidentification. (*People v. Sykes* (1987), 161 Ill. App. 3d 623, 633, 515 N.E.2d 253, 260.) Defendant bears the burden of establishing that the pretrial confrontation was unduly suggestive, and courts look to the totality of the surrounding circumstances in reaching their conclusion. (161 Ill. App. 3d at 633, 515 N.E.2d at 260.) Further, the fact that a defendant is the only participant in the lineup with braided hair does not render it impermissibly suggestive where defendant is not forced to wear his hair in braids and there are no other significant physical or racial differences among the participants. *People v. Trass* (1985), 136 Ill. App. 3d 455, 463, 483 N.E.2d 567, 574.

■ Here, the record reveals that both Moore and Granberry made positive identifications of defendant based on his physical characteristics. Moore told police that the offender was 5 feet 3 or 4 inches tall, thin looking and weighed about 120 to 130 pounds. Granberry described the offender as shorter than the victim, with a mustache and short beard. These descriptions accurately reflect defendant's actual physical characteristics on the day of the shooting. Further, because defendant had an opportunity to remove the braids from his hair and there were no significant physical or racial differences among the other participants in the lineup, it was not unconstitutionally suggestive. Therefore, we conclude that the trial court did not err in denying defendant's motion to suppress the lineup and in-court identifications.

■ Defendant next argues that the jury verdict was against the manifest weight of the evidence and should be reversed. We disagree. A verdict is contrary to the manifest weight of the evidence only when the opposite conclusion is clearly apparent and the finding ap-

pears to be unreasonable, arbitrary and not based on the evidence. (*People v. Rey* (1985), 136 Ill. App. 3d 645, 650-51, 483 N.E.2d 982, 986.) In the present case, the evidence reveals that the jury's verdict was based on the testimony of two eyewitnesses. In view of the testimony presented to the jury, no other conclusion is clearly apparent. Since is it clear that the jury's verdict is neither unreasonable, arbitrary nor not based on the evidence, we conclude that the jury's verdict is not against the manifest weight of the evidence.

We have considered the other issues raised by defendant on appeal and find them to be without merit.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

FREEMAN, P.J., and McNAMARA, J.,* concur.

---

*Justice McNamara participated in this opinion prior to his assignment to the sixth division.