THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ROOSEVELT CARR, Defendant-Appellant.

First District (6th Division) No. 1—87—0417

Opinion filed September 1, 1989.—Rehearing denied October 6, 1989.

Randolph N. Stone, Public Defender, of Chicago (Bruce C. Landrum, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Carol L. Gaines, and Sari L. Slivnick, Assistant State's Attorneys, of counsel), for the People.

JUSTICE QUINLAN delivered the opinion of the court:

The defendant, Roosevelt Carr, was found guilty in a bench trial before the circuit court of Cook County on charges of murder, robbery, and armed violence in connection with the shooting of a Chicago police officer. The trial court sentenced defendant to imprisonment for life. Defendant now appeals his convictions and his sentence.

The following evidence was adduced at defendant's trial. During the summer of 1985, Chicago police officer Cheriff Morgan and the victim, Detective Wayne King, were partners. Both worked in the Office of Municipal Investigations (OMI), where they investigated allegations of criminal and administrative misconduct against city employees. In July 1985, Officer Morgan and Detective King were involved in an ongoing investigation of the defendant, who was suspected of impersonating a police officer and a city inspector. In connection with their investigation, a warrant for defendant's arrest had been issued.

On July 12, 1985, Officer Morgan and Detective King were on duty together, dressed in plain clothes. Detective King was carrying a .38 caliber revolver which he had tucked into the waistband of his pants. That afternoon, at about 2 p.m., they met with two other officers, Jackson and Alexander, to formulate a plan to find the defendant.

Later that day, Officer Morgan and Detective King were in their police car when they got a call that the defendant was in a light blue

Ford Tempo near the intersection of 45th and State. Officer Morgan and Detective King proceeded to that location, and when they arrived at the intersection of 51st and Michigan, at about 4 p.m., they saw a light blue Ford Tempo. They pulled alongside the Tempo, but they did not see the defendant in the car. The officers began to question the occupants of the Tempo when Detective King saw the defendant walk around the corner. When the defendant looked towards Officer Morgan and Detective King, he turned and ran away from them.

Detective King chased the defendant on foot while Officer Morgan called for assistance on the police radio. While Detective King was still in pursuit of the defendant, Officer Morgan got into their police car to follow. When Officer Morgan drove around the corner onto Michigan Avenue, she saw Detective King, who was facedown on the sidewalk.

Meanwhile, two other police officers, Bone and Ware, were on duty and driving near the intersection of 51st and Michigan. At about 4:10 p.m. they heard two shots and saw people running across Michigan Avenue. They immediately pulled over and got out of their car. They saw one man bent over at the waist, and his chest was covered with blood. He was walking toward them when he fell to his knees and then collapsed down to the ground. They also saw another man, identified as the defendant, running north on Michigan Avenue, about a half a block away. Officer Ware pursued the defendant on foot, while Officer Bone called for assistance. At this point, Officer Morgan drove up to where Officer Bone was stopped. Officer Ware continued to chase the defendant to the intersection of 50th and Michigan, where the defendant turned the corner to head east on 50th.

While Officer Ware was in pursuit of the defendant, two other officers from the tactical unit, Officers Rider and Stewart, were responding to the calls for assistance. When Officers Rider and Stewart arrived at the location given on the radio, they saw the defendant. Officer Stewart got out of the car with his gun drawn, identified himself as a police officer, and ordered the defendant to stop. Defendant took his hands out of his pocket and placed the gun he had in his pocket on the ground. That gun contained four live rounds and two expended rounds. Officers Rider and Stewart then arrested the defendant.

Other eyewitness testimony was presented at trial. Katherine Holt testified that she was buying gas at a station on the northwest corner of the intersection of 51st and Michigan, when she saw an older man following a younger man, identified as the defendant. Both were heading north on the east side of Michigan Avenue. When the older man reached the defendant, she saw the older man grab defend-

ant's hand, pull it behind defendant's back, and push him against the wall. A struggle ensued as the defendant attempted to turn towards the older man. Both men fell to the ground, and the older man was on top of the defendant when she heard a shot. She stated that she saw the two men roll over again, so that the defendant was on top, when she heard a second shot. As the second shot was fired, she saw the defendant jump up and run north on Michigan Avenue. At that time, she said she saw the older man get up on his knees, only to fall face down on the ground.

Three other witnesses, Lessie Simmons, Tawyana Dugger, and Carl Murphy, saw the shooting also. Their testimony was substantially the same as Ms. Holt's testimony, but they also noticed that when defendant ran away, he had a gun in his hand.

Later that day, at about 10 p.m., Detective John Markham held a lineup at the police station. The defendant was identified in the lineup by Officer Morgan, Katherine Holt, Lessie Simmons, Tawyana Dugger, and Carl Murphy.

In addition to this evidence, the State also introduced the testimony of Richard Fournier, a firearms expert with the Chicago police department. He examined the gun that was in defendant's possession at the time he was arrested, as well as the bullets that were taken from the victim's body. Fournier testified that the gun was a .38 caliber revolver and stated that he performed certain tests on the weapon. Fournier stated that, in his opinion, the bullets from the victim's body were fired from the same weapon he had examined. Concerning the tests he performed on the gun, he stated that for the gun to fire two shots, or for "double action" use, the trigger would have to be completely depressed, released and then completely depressed again. He stated also that he had performed "pull tests" on the gun, and said that for "single action" use, the trigger required three pounds of pressure to fire, and for "double action" use, the trigger required 9½ pounds of pull to fire. Fournier testified that these figures were within the factory specifications for this type of weapon.

During Fournier's testimony at trial, defense counsel objected and moved to strike his testimony concerning all tests on the gun, except the ballistics and bullet comparison tests, on the basis that the State never revealed any of the other test results prior to trial. The State argued that there was only one final report prepared by Fournier, namely the ballistics and bullet comparison report, and that these other test results and findings were merely a result of Fournier's examination of the weapon in order to perform the ballistics tests. The trial court denied defendant's motion. Defendant then asked for a

continuance in order to have the weapon independently test-fired, and the State objected, claiming that the defendant had had more than a year prior to trial to do so. The trial court denied the defendant's request for a continuance, noting as it did so that the matter had been pending for a year, that defendant had been represented by the public defender's office the entire time, and that when the matter was called for trial, both sides answered that they were ready for trial.

After Richard Fournier testified, the State attempted to call Sergeant John Capesius and Officer Charles Jackson to testify. Before these two witnesses began to testify, however, the defense objected because their names were not on any discovery lists tendered by the State. The State claimed it was unaware of this allegedly inadvertent error and offered the defense the opportunity to interview the witnesses before they testified. Further discussion of this objection revealed that the defendant had subpoenaed the police reports of defendant's prior arrests and that the names of these officers were listed on these reports. The trial court then overruled the defense objection, allowed the State to amend its list of witnesses, and gave defense counsel the opportunity to interview the witnesses. Defense counsel then made a second objection to Sergeant Capesius' testimony on the basis that it was immaterial since the State had indicated in discovery that it would not rely on defendant's prior arrests. The State, however, claimed that this testimony was material because it was necessary to show that defendant knew the victim was a police officer. The court then ruled that it would allow the testimony with the admonition that if the State could not show the materiality of the evidence, it would be stricken. Defense counsel then proceeded to interview Sergeant Capesius.

Thereafter, Sergeant Capesius took the stand and testified that in November 1983, he worked in the OMI. He stated that he and the victim were partners in the OMI at that time. He said that he and the victim had been involved in an investigation of the defendant for impersonating a building inspector and that a warrant had been issued for defendant's arrest. On November 8, 1983, he and the victim arrested the defendant. Sergeant Capesius said that in connection with that arrest, the victim read the defendant his rights and interviewed the defendant for about 15 minutes and, further, that the victim was the designated court officer in that case.

Chicago police officer Charles Jackson also testified for the State. He stated that he had been the victim's partner in the OMI on April 5, 1984, and that both he and the victim had received a warrant for defendant's arrest and, pursuant to that warrant, they arrested the

defendant. When they arrested the defendant, Jackson testified that the victim read defendant his rights and they both accompanied the defendant to the police station.

At the end of Officer Jackson's testimony, defense counsel renewed his objection that this testimony was not properly admitted because the State had violated the discovery rules. The court again overruled defendant's objection, noting as it did so that even though Jackson was not on the State's list of witnesses, he was listed on the police reports of defendant's prior arrests and defendant had access to these reports.

The State also presented the testimony of Dr. Robert Steiner, the chief medical examiner of Cook County, who testified that he performed an autopsy on the victim and found two bullets and two bullet holes in the victim's chest. After the presentation of this evidence, the State rested.

The defense presented, as its only evidence, a stipulation concerning the testimony of one witness, David Rhines. The stipulation said that, if called to testify, Rhines would state that he was repairing a concrete sidewalk at 205 East 50th Street on July 12, 1985, at about 4 p.m. when a man ran by, through the wet concrete. Rhines yelled at the man, and the man answered "I'm sorry," and continued running. Rhines then saw a plainclothes police officer run by who told Rhines that the man who had just run by had shot someone. The defense then rested. The trial court found defendant guilty of murder, robbery, and armed violence. On January 12, 1987, the court held a hearing to determine whether the death penalty should be imposed.

Defendant executed a jury waiver for the sentencing phase, and evidence was presented by both sides. The court determined that defendant was eligible for the death penalty based on the State's unrefuted evidence which showed that the defendant knew that he had killed a police officer. The court then reviewed the evidence in aggravation, and the evidence in mitigation, which included the testimony of defendant's pastor, his ex-wife, and his daughter. The court then ruled that the death penalty would not be imposed, due to the mitigating factors in the case, and sentenced defendant to natural life imprisonment for murder, seven years for robbery, and 30 years for armed violence, all to run concurrently. As noted above, defendant now appeals his convictions and his sentence.

Defendant raises five issues on appeal: (1) whether the trial court erred when it admitted evidence of defendant's other crimes; (2) whether the trial court erred when it allowed the testimony of Officers Capesius and Jackson in violation of the discovery rules; (3)

whether the trial court erred when it allowed the testimony of Richard Fournier, the State's ballistics expert, in violation of discovery rules; (4) whether the trial court properly found the defendant guilty beyond a reasonable doubt; and (5) whether the defendant's sentence of natural life imprisonment was excessive.

The defendant first claims that the trial court erred when it admitted evidence of defendant's other crimes at trial. He claims that evidence of other crimes is only admissible if it is relevant to motive, intent, knowledge, identity, absence of mistake, or accident, but that here the evidence was not relevant to any of these legitimate purposes. The evidence of other crimes was admitted, he claims, only to show that he allegedly knew that the victim was a police officer when he shot him and, therefore, he contends, was only relevant to the death penalty phase of the trial. Defendant concludes that because the evidence in this case was closely balanced, the admission of this improper evidence was tantamount to reversible error.

The State, on the contrary, claims that admission of this evidence was proper, because it was admitted to show the defendant's motive to kill the victim. Thus, this evidence went directly to the issue of whether defendant was guilty beyond a reasonable doubt, as well as to whether the defendant, if found guilty, was eligible for the death penalty. It is within the province of the trial judge to weigh the relevance of this type of evidence, and here, the State contends, the trial judge properly determined that this evidence was relevant to defendant's guilt. In addition, the State maintains that even if this evidence was erroneously admitted, any such error was harmless because the remaining evidence established defendant's guilt beyond a reasonable doubt.

■■ ■ Evidence of other crimes is generally not admissible to show propensity to commit crime; however, it may be admissible if it is relevant to establish any material question or to show motive or intent. (*People v. Stewart* (1984), 105 Ill. 2d 22, 56, 61-62, 473 N.E.2d 840, 857-60; see also *People v. Richardson* (1988), 123 Ill. 2d 322, 339, 528 N.E.2d 612, 617.) As a general rule, admissible evidence must be both relevant and competent. Any evidence which tends to show that the defendant had a motive for killing the deceased is generally relevant, and to be competent, the evidence must, at least to a slight degree, tend to establish the existence of the motive asserted. (*Stewart*, 105 Ill. 2d at 56, 473 N.E.2d at 857.) However, where such evidence is deemed to have been improperly admitted, a defendant's conviction will not be reversed if it does not appear that justice has been denied or that a finding of guilt resulted from the error. *Richardson*, 123 Ill.

2d at 344, 528 N.E.2d at 619.

■ Here, the evidence of other crimes could easily have been the basis for showing defendant's motive to shoot the victim. The evidence established that the victim had taken part in defendant's past arrests and, thus, there was a great likelihood that defendant knew the victim was a police officer. This evidence supported a possible motive for defendant's shooting of the victim. Even if we were to find, however, that this evidence was improperly admitted and was irrelevant in the guilt phase of the trial, it appears that any error was harmless, because there was, in our opinion, overwhelming evidence of defendant's guilt in this case.

Defendant next claims that the trial court erred when it allowed Officers Capesius and Jackson to testify, because their names were not included, as required, in the list of witnesses tendered to defendant during the discovery process. (See 107 Ill. 2d R. 412; Ill. Rev. Stat. 1987, ch. 38, par. 114—9(a).) When the State called these two witnesses, the defendant argues, he was taken by surprise and did not have adequate time to prepare. He was prejudiced, he claims, because had he known of this testimony, he could have investigated the facts on his own to determine how likely it was that he had seen or that he knew the victim from his prior arrests. The defendant claims that the short recess granted by the trial court was insufficient to alleviate this prejudice. Finally, he contends that he could not have anticipated that these witnesses would be called in the guilt phase of the trial.

The State, however, claims that although Officers Capesius and Jackson were not included in their list of witnesses, this omission does not require a reversal here, because the defendant was not prejudiced by their omission. There was no prejudice, the State contends, because the officers' names were contained in the police reports of his prior arrests, which defendant had subpoenaed prior to trial. Moreover, the State continues, defense counsel was given time, before the officers' testimony, to interview the witnesses. Defendant here has not shown how the court abused its discretion, the State concludes, because he has not shown how he was prejudiced or surprised, nor has he shown that the State acted in bad faith.

■ Supreme Court Rule 412(a)(i) creates an affirmative duty on the State to disclose intended witnesses to the accused. (107 Ill. 2d R. 412; *People v. Curtis* (1986), 141 Ill. App. 3d 827, 832, 491 N.E.2d 134, 137-38.) If the defendant can show that the State violated a discovery rule, the next line of inquiry then becomes whether the defendant was surprised or prejudiced by the violation, and the burden is on the defendant to show how he was prejudiced. (*Curtis*, 141

Ill. App. 3d at 832, 491 N.E.2d at 138.) If the defendant cannot show how he was prejudiced, the resulting error will generally be harmless. (*People v. Padilla* (1988), 173 Ill. App. 3d 357, 360, 527 N.E.2d 700, 703.) When a trial court is confronted with a discovery violation by a party, it is within the court's discretion to order a continuance, mandate a disclosure, or permit use of the evidence at trial. *People v. Taylor* (1982), 107 Ill. App. 3d 1019, 1022, 438 N.E.2d 565, 567.

■ Here, there is no doubt that there was a discovery violation by the State because Officers Capesius and Jackson were not on the State's list of witnesses tendered to the defendant. Although there was a violation, the resulting prejudice to the defendant when the court ultimately allowed these witnesses to testify, after defense counsel had the opportunity to interview them, is unclear. Moreover, it is not clear how the defendant was surprised by the officers' testimony, since he had the prior arrest reports listing these officers and the victim. He knew that this was a potential death penalty case, and that the State would therefore present evidence to show he knew the victim was a police officer pursuant to the death penalty issue. Finally, we note that any investigation by the defense concerning the level of the victim's involvement in the defendant's prior arrests would have begun with information the defendant himself could have provided. Thus, we find no abuse of discretion here by the trial court, and further find that any error as a result of the discovery violation was harmless.

Defendant claims, as his third issue on appeal, that the trial court erred when it failed to strike the testimony of Richard Fournier, the firearms expert, concerning the "pull tests" he performed. Defendant claims that this testimony violated the discovery rules because the State never tendered any documentation to him regarding this type of test. The testimony surprised and prejudiced him, he asserts, because it was crucial to his defense to establish that the victim was shot accidentally. To refute Fournier's testimony and show that the gun had a "hair trigger," or that the gun was not within the factory safety specifications, he would have had to do his own independent testing on the gun, and the court should have given him a continuance to do such testing.

The State, however, claims that the testimony did not violate the discovery rules inasmuch as it had tendered Fournier's only written report to the defense, as required by Rule 412. (107 Ill. 2d R. 412.) Moreover, the State argues, even if this was determined to be a violation of the discovery rules, reversal would not be warranted unless the defendant could show that he was surprised or prejudiced, and the

defendant has made no such showing here. Furthermore, the State notes, during the trial, defense counsel actually stated that this evidence was not damaging to their case.

▮▮ ▮ Supreme Court Rule 412(a)(iv) requires that the State disclose any reports or statements of experts made in connection with the particular case, including results of scientific tests, experiments or comparisons. Again, a violation of a discovery rule does not mandate a reversal unless the defendant can show surprise or prejudice. (107 Ill. 2d R. 412; *People v. Jackson* (1985), 131 Ill. App. 3d 128, 137, 474 N.E.2d 466, 473.) A similar situation to that presented here arose in *People v. Taylor* (1982), 107 Ill. App. 3d 1019, 438 N.E.2d 565. There, the defendant claimed he was prejudiced by the State's failure to disclose the existence of a ballistics test and the report made by a firearms expert prior to trial. Before the expert testified, defense counsel was given a copy of the report, and was allowed to interview the expert in chambers. (*Taylor*, 107 Ill. App. 3d at 1022, 438 N.E.2d at 568.) The report was not admitted at trial, but the firearms expert in *Taylor* testified to the matters in the report. The *Taylor* court noted that the report was neutral or noncommittal and, thus, could not have affected the verdict. The court then concluded that under the circumstances there, the defendant was not surprised or prejudiced by the State's discovery violation. *Taylor*, 107 Ill. App. 3d at 1022-23, 438 N.E.2d at 568.

▮▮ In the case at bar, it is unclear whether there was any discovery violation by the State at all. Although Fournier testified at trial and stated that his report did not specifically indicate that he had performed any "pull tests," an examination of his report clearly shows that the results of such tests were set forth in the report, which was only one page in length. In Fournier's report, under the heading "Single Action," Fournier listed "2½-3," and under the heading "Double Action," Fournier listed "9-9½." This data is consistent with Fournier's testimony at trial, in which he explained that the trigger held at two and one-half pounds, and released at three pounds, for "single action," and that the trigger held at nine pounds and released at nine and one-half pounds for "double action." Fournier also testified that the minimum factory requirements for this type of gun were, for "single action," two and one-half pounds and for "double action," nine pounds. Based on this information, we do not believe that there was any discovery violation by the State. Fournier prepared a one-page report, the report was tendered to the defense, and Fournier testified concerning the data on the report.

Even if we did find that there had been a discovery violation here,

again, we do not see how defendant was surprised or prejudiced by the admission of Fournier's testimony. As the trial court noted, the defendant had access to the gun for the entire year the case was pending. Further, when the court inquired how long it would take defense counsel to test the gun, defense counsel had no idea. Moreover, if the defendant had wanted to pursue an affirmative defense that the gun had a "hair trigger," he should have sought to have the gun examined before the trial. In any event, Fournier's findings only showed that the gun was within the normal factory specifications and, thus, the report itself would seem to be relatively neutral in nature. Furthermore, defense counsel, at trial, stated, "I'm not arguing that [Fournier's] testimony was that damaging, however, the State felt it was relevant enough to put it in, but my [problem] is that there are rules to be followed ***." We find that there was no abuse of discretion here when the trial court allowed the evidence.

Defendant claims next that he was not proven guilty beyond a reasonable doubt. He argues that it was reasonable to assume that the victim pulled the gun on him while in the process of arresting him, and that the gun, which had, he asserts, almost a "hair trigger," went off accidentally.

The State, however, contends that the evidence showed the defendant's guilt beyond a reasonable doubt. There were four eyewitnesses who saw the attempted arrest, and the ensuing struggle, heard the shots, and then saw defendant immediately jump up and run away with a gun in his hand. The eyewitness testimony was, in addition, corroborated by the testimony of the police officers, and the firearms expert, Richard Fournier. Fournier's testimony, in particular, established that it would have been unlikely that the trigger could have been accidentally compressed, released, and then accidentally compressed again.

It is the function of the trier of fact to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from all of the evidence. (*People v. Young* (1989), 128 Ill. 2d 1, 51, 538 N.E.2d 461, 473.) It is also within the province of the trier of fact to resolve any conflicts in the evidence. (*Young*, 128 Ill. 2d at 51, 538 N.E.2d at 474.) Because of these basic principles, a reviewing court will not substitute its judgment for that of the jury on questions involving the weight of the evidence or the credibility of the witnesses, and will not reverse a conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *Young*, 128 Ill. 2d at 51, 538 N.E.2d at 474.

■■■ There is no question here that the evidence proved defendant guilty beyond a reasonable doubt. There were four eyewitnesses to the actual shooting, and their stories were entirely consistent. The witnesses all agreed that the defendant and the victim struggled while the victim was attempting to arrest defendant, and they both fell to the ground fighting. A first shot went off, and, within seconds, they said a second shot went off. The defendant immediately jumped up and ran away, carrying a gun in his hand. Moreover, additional evidence was presented to infer that the defendant knew the victim was a police officer when he shot him since the victim had arrested the defendant twice before. Thus, the evidence against the defendant overwhelmingly established his guilt.

Finally, defendant claims that his natural life sentence was excessive because the mitigating factors such as his age, which was 38, the lack of violence in his criminal record, and his good family relations all showed his potential for rehabilitation. Any sentence above the minimum, defendant contends, would be excessive.

The State argues that defendant's sentence was not excessive because the evidence of guilt was overwhelming, and, moreover, there was a strong aggravating factor here in that defendant shot a police officer, and knew that he shot a police officer. Thus, the State contends that the trial judge properly considered and weighed all factors in aggravation and mitigation and sentenced defendant to natural life imprisonment.

■■■ The standard of review to be applied in sentencing issues was discussed by our supreme court in *People v. Ward*:

" 'We have frequently stated that the trial judge is normally in a better position to determine the punishment to be imposed than the courts of review. [Citations.] A reasoned judgment as to the proper sentence to be imposed must be based upon the particular circumstances of each individual case. [Citation.] Such a judgment depends upon many factors, including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. [Citation.] *** [T]he trial judge's decisions in regard to sentencing are entitled to great deference and weight. We therefore reaffirm our long-standing rule that absent an abuse of discretion by the trial court a sentence may not be altered upon review.' " *People v. Ward* (1986), 113 Ill. 2d 516, 525-26, 499 N.E.2d 422, 425, quoting *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882, 884.

See also *People v. La Pointe* (1981), 88 Ill. 2d 482, 492, 431 N.E.2d 344, 348-49.

 Here, in the sentencing hearing, the trial judge heard all of the evidence, including all of the factors in aggravation and mitigation. He then concluded that the defendant was eligible for the death penalty because he found that defendant knew at the time of the shooting that he had killed a police officer. The court then, however, decided that because of the mitigating factors here, the death penalty would not be imposed, but instead determined that the imposition of a natural life sentence was proper. We find that the court acted properly and did not abuse its discretion in this determination.

For all of the foregoing reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

EGAN, P.J., and McNAMARA, J., concur.