THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDDIE BURTS, Defendant-Appellant.

First District (6th Division)   No. 1—90—0768

Opinion filed November 29, 1993.

Rita A. Fry, Public Defender, of Chicago (Ronald P. Alwin, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Michelle Lavin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

This is a domestic violence case in which the defendant, Eddie Burts, beat the victim, Vickie Armstrong, and she died as a result of the beating. He was convicted after a bench trial of first degree murder and sentenced to 30 years' imprisonment. He contends first that the evidence was insufficient to support a finding of guilty of first degree murder and asks that we reduce his conviction, if affirmed, to second degree murder. He also maintains that trial error occurred that would entitle him to a new trial and that error occurred during his sentencing hearing.

In June 1989, the defendant was living with Vickie Armstrong and her two daughters. They had lived together for approximately six months; each was married to someone else. The defendant was 38 years old and had lived in Chicago for many years. He had been running a small construction business with his brother. Both Armstrong and the defendant also worked occasionally for a real estate broker, Allen Jones, who was introduced to the defendant by Armstrong and subsequently became a social friend of the defendant. Armstrong had been employed as a managerial secretary at Illinois Bell for about 19 or 20 years. She worked in Jones' real estate office on weekends. The home that she and the defendant lived in at 1400 North Menard in Chicago was owned by Armstrong.

On June 15, 1989, Chicago police officer Ben Harris arrived at the home at 1400 North Menard about 1 a.m. in response to a call. The defendant told him that his girl friend was injured. Harris saw Armstrong lying face up on the dining room floor. She appeared to be

unconscious, her eyes looked swollen and there was blood on her mouth. Harris noticed what appeared to be blood on the upper part of her nightgown and also on the wall, the lower half of a china cabinet, the lower leg of a dining room table and the carpet about one foot from her head. Armstrong's five-year-old daughter, Tiffany Luckette, was also present.

When Harris noticed what appeared to blood splatters on the front of Tiffany's shirt, he asked the defendant what had happened. The defendant first told him that the victim had fallen and was injured. Harris then asked the defendant to tell him exactly what had happened. Harris testified that the defendant then told him that they had an argument and he hit her a couple of times with his hands. At that point the child, Tiffany, told the police officer something, and then the defendant said that they had an argument, and he struck Armstrong five or six times with the back of his hand. Harris called the fire department paramedics, who transported Armstrong to the hospital, where she died two days later.

Harris testified that while the defendant was being transported to the police station, he stated, "No bitch cheats on me." Harris admitted that he had not put this statement into his police report although he had time to do so but chose not to. Harris did put in the police report the fact that the defendant said he accused the victim of cheating on him. Harris first told an assistant State's Attorney about the statement the defendant made in the squad car on the day Harris testified.

Assistant State's Attorney Michelle Katz, who was assigned to the felony review unit, testified that she interviewed the defendant at Area Five Headquarters at about 6:15 a.m. on June 15. She introduced herself to the defendant and said she was a lawyer working with the police; she was not the defendant's lawyer. She advised the defendant of his rights, and he said he understood them and would speak with her. The defendant told her that he had done some investigating and found out that his girl friend, Vickie Armstrong, had been having an affair. After learning that, he went home, woke her up and "beat the shit out of her." Katz asked the defendant why he had "beat the shit out of her," and he said, because she's a "fucking bitch" and she had lied to him.

Katz asked the defendant how many times he had hit Armstrong, and the defendant said he had hit her quite a number of times about the face and head. The defendant said he did not want to give a written statement.

Before Katz interviewed the defendant she had gone to Loyola Hospital with Detectives Poli and Dolan to investigate. In the emer-

gency room Katz saw Armstrong, who was unconscious. Katz observed multiple areas on Armstrong's face and body that were discolored and severely swollen. Armstrong's face was completely swollen. There were contusions on her chin and around her lip area. Her chest had contusions all over it, and her arms were discolored and swollen.

Dr. Shaku Teas performed an autopsy on the body of Armstrong on June 17. The external examination revealed multiple areas of abrasions on her forehead and a bruising on the left side of her face, both of her breasts, her right shoulder and her left forearm. Armstrong had a subdural hemorrhage on the right side of the brain and contusions and hemorrhages inside the brain. Teas stated that the cause of death was "cranial cerebral injury due to blunt force, trauma or injury." In her opinion the injuries were inflicted by more than one blow.

Chicago police officer Lawrence Poli was called as a defense witness. He testified that he spoke to the defendant at 1 a.m. on June 15. The defendant told him that he had awakened Armstrong and confronted her with the fact that he thought she was having an affair with a real estate broker by the name of Al Jones. At that time they quarreled. The defendant struck her approximately five or six times; he said he might have struck her more. He was not sure. She then fell to the ground. Poli did not recall whether the defendant used any profanity at the time Poli spoke to him.

Poli was later present at the questioning of the defendant by Michelle Katz. The defendant said, "I beat the shit out of her. She was a lying bitch." Poli did not put that statement in any report. He did not take any notes during the interview Katz had with the defendant. After the prosecutor showed him his general progress report, his recollection was refreshed. That report showed that the defendant told Poli that when he arrived home at 1 o'clock he woke Armstrong up and accused her of having an affair. The defendant said, "She was fucking around."

The defendant testified that he arrived at Jones' real estate office at 9 a.m. on June 14. Jones and three other men, including a man named Clyde, were at the office. The men "were sitting around talking and drinking" until approximately midnight. The defendant left the office with Clyde and drove Clyde home. In the car, Clyde told the defendant that Armstrong and Jones were having an affair.

After leaving Clyde at his house, the defendant drove to the house he shared with Armstrong. He entered the kitchen through the back door of the house and yelled for Armstrong by "call[ing] her out real loud" once. He was angry when he called her. He testified that "[s]he

got up and asked [him] what [he] wanted." The only light on in the house was the bedroom light.

The defendant told Armstrong he "found out [she was] messing around with Jones." She did not admit or deny this accusation. Next, he "caught her by the arm with [his] right hand" on her left shoulder. He was the first person to initiate any physical contact. Armstrong tried to break away from him and in doing so hit him across the left shoulder. He struck her in the face with the back of his hand five or six times. She was standing in one place, in the kitchen near a china cabinet, while he hit her. When he hit her the sixth time, she fell to the ground. He did not know if she hit her head on anything as she fell. He also did not know if she struck any walls. He admitted telling Poli that he possibly hit Armstrong while she was on the ground; at trial he first said he did not know whether he had hit her while she was on the ground; later he denied hitting her when she fell. He did not know if he hit her arms, back, or chest during the argument.

The defendant turned on the light in the kitchen and saw that Armstrong was injured. He called 911. While he was waiting for the police or ambulance, he put a longer nightgown on Armstrong because the gown she had been sleeping in was very short. He finished slipping on the longer gown after the police arrived; he denied doing this just to remove a gown that was blood-covered. When he realized Armstrong was hurt, the defendant "got a towel and was trying to put it on her face." He denied wiping any blood off her face; he explained that he only wanted to soothe her with a cool towel.

The defendant testified that he talked to Officer Harris before and after his arrest and that he talked to Detective Poli and Assistant State's Attorney Katz at the station. He denied using profanity in any of these conversations and denied calling Armstrong a liar or otherwise commenting negatively about her.

The defendant's first contention is that his conviction should be reduced to second degree murder because he acted under a sudden and intense passion when he killed Armstrong. Under Supreme Court Rule 615(b)(3) (134 Ill. 2d R. 615(b)(3)), this court has the power to reduce the defendant's conviction to second degree murder.

Section 9—2 of the Criminal Code (Ill. Rev. Stat. 1989, ch. 38, par. 9—2) provides that a crime is second degree murder, previously voluntary manslaughter (*People v. Davis* (1991), 221 Ill. App. 3d 1023, 1025, 583 N.E.2d 64), if the State proves all the elements of first degree murder beyond a reasonable doubt, but there is a mitigating factor. One mitigating factor exists where the defendant "is acting under a sudden and intense passion resulting from serious provoca-

tion by the individual killed." (Ill. Rev. Stat. 1989, ch. 38, par. 9—2(1).) The statute defines "serious provocation" as "conduct sufficient to excite an intense passion in a reasonable person." (Ill. Rev. Stat. 1989, ch. 38, par. 9—2(b).) The defendant has the burden of proving serious provocation by a preponderance of the evidence. (Ill. Rev. Stat. 1989, ch. 38, par. 9—2(c); see *People v. Brown* (1991), 218 Ill. App. 3d 890, 895-96, 578 N.E.2d 1168; *People v. Schorle* (1990), 206 Ill. App. 3d 748, 757, 565 N.E.2d 84.) Whether "an altercation constitutes sufficient provocation to reduce a conviction of [first degree] murder to one of [second degree murder] is an issue to be resolved by the trier of fact [citation], and a reviewing court will not upset the \*\*\* finding unless the evidence is so \*\*\* unsatisfactory as to leave a reasonable doubt of the defendant's guilt." *People v. Stanley* (1986), 146 Ill. App. 3d 912, 919, 497 N.E.2d 496.

There are four alternative grounds on which a finding of provocation may be based: assault, mutual combat, illegal arrest, or adultery by or with the defendant's spouse. (*People v. Chevalier* (1989), 131 Ill. 2d 66, 544 N.E.2d 942.) In our judgment, as a matter of law, the defendant has failed to prove any basis for a finding of provocation. He does not argue that he has established assault or, needless to say, illegal arrest. Instead, his argument seems to be that the evidence shows a hybrid ground consisting of parts of mutual combat and parts of adultery by a spouse. He cites no authority for such a combination, and we reject it. We will therefore consider whether the defendant has introduced any evidence which would justify a finding of provocation based on adultery by a spouse or mutual combat.

■ The defendant and Armstrong were not married to each other, and the Illinois Supreme Court has indicated that provocation caused by adultery might be available only to a legally married defendant, although it recently declined to reach this question. (*People v. McCarthy* (1989), 132 Ill. 2d 331, 547 N.E.2d 459.) Even in the case of the killing of one spouse by another, however, "adultery with a spouse as provocation generally has been limited to those instances where the parties are discovered in the act of adultery or immediately before or after such act, and the killing immediately follows such discovery." (*Chevalier*, 131 Ill. 2d at 72.) Here, there was no evidence that any "adultery" ever occurred; the defendant merely believed what someone had told him. In *Chevalier*, the supreme court held that a communication to the husband by the wife that she had committed adultery was insufficient provocation; *a fortiori*, a communication by the Iago-like Clyde would be insufficient. Therefore, the defendant cannot prevail on any argument that he was provoked to kill Armstrong by her alleged affair with Jones.

Similarly, we reject the defendant's contention that he was legally provoked to kill Armstrong through mutual combat. "Where a defendant attacks a victim on slight provocation with disproportionate violence, the mutual combat aspect of provocation does not apply as a matter of law." ( *People v. Dower* (1991), 218 Ill. App. 3d 844, 853, 578 N.E.2d 1153.) "[M]utual combat which may constitute adequate provocation *** [must involve] a 'fight or struggle which both parties enter willingly or in which two persons, upon a sudden quarrel, and in hot blood, mutually fight upon equal terms and death results ***.' [Citation.]" *People v. Lockhart* (1990), 201 Ill. App. 3d 700, 714, 558 N.E.2d 1345.

The violence used by the defendant was not in proportion to any provocation caused *if* Armstrong hit his shoulder, and their argument was not a willing or equal fight indicating intense passion in a reasonable man. Even if the defendant's testimony was entirely true, Armstrong was not a willing, equal fighting partner. The defendant's own testimony was that he initiated the fight and that she did not move while he was hitting her. Further, he testified that she only hit him in an attempt to free herself. See *People v. Miller* (1981), 96 Ill. App. 3d 212, 421 N.E.2d 406.

The medical evidence, the description of Armstrong at Loyola Hospital and the amount of blood found in several places in the house show that Armstrong was violently killed. Further, the defendant was calm enough after the killing to put a different gown on Armstrong and to place a cold towel on her face. (*Cf. People v. Stanley* (1986), 146 Ill. App. 3d 912, 497 N.E.2d 496 (actions after killings which indicate calmness or rational thinking can indicate a lack of passion).) He also had the presence of mind to try to mislead Officer Harris. We conclude that the judge properly found no mitigating factor under section 9—2 sufficient to reduce the crime to second degree murder. Indeed, we find that, if this case had been heard by a jury, the defendant would not have been entitled to a second degree murder instruction. See *Chevalier*, 131 Ill. 2d at 76.

The defendant next maintains that reversible error occurred when the judge refused to strike part of Harris' testimony and to grant a mistrial after Katz testified.

Katz, a member of the felony review unit, wrote down on her "felony review folder" a summary of her conversation with the defendant. Immediately after opening statement, but before the witnesses were sworn, the defendant's attorney told the judge that he had been given the felony review statement that morning and that he had never seen it before. For that reason he objected to its use. The State contended that the statement given to Katz was essentially

the same as the statement given to Poli which was summarized in the police report. The State said the same thing about Harris' testimony.

■ We agree with the defendant that Harris' testimony that the defendant told him in the squad car, "No bitch cheats on me" and Katz' testimony of what the defendant told her are more damaging than what is contained in the police reports. The statements to Harris and to Katz reflect malice on the part of the defendant. But we do not believe any prejudicial error occurred by the admission of those statements.

Supreme Court Rule 412(a)(ii) (134 Ill. 2d R. 412(a)(ii)) provides that the State must tender to the defense, upon request, "the substance of any oral statements made by the accused." The State is not required to make a transcript or memorandum of the defendant's oral statement, but must disclose "the substance of the oral statements." (*People v. Wielgos* (1991), 220 Ill. App. 3d 812, 816-17, 581 N.E.2d 298.) The rule is mandatory, and compliance is excused only when the State, by the exercise of due diligence, could not have learned of the defendant's statement before trial. *People v. Patterson* (1981), 102 Ill. App. 3d 844, 430 N.E.2d 574.

Nonetheless, "[e]ven if the State fails to exercise due diligence, noncompliance with Rule 412 does not require a reversal absent a showing of prejudice" which was not cured by the trial judge. (*Patterson*, 102 Ill. App. 3d at 847; see also *People v. Cisewski* (1987), 118 Ill. 2d 163, 514 N.E.2d 970.) A judge has discretion to fashion a remedy for any discovery violation, but "exclusion of the evidence is a last resort, required only where a recess or continuance would be ineffective." (*People v. Washington* (1989), 182 Ill. App. 3d 168, 174, 537 N.E.2d 1354.) The defendant has the burden of showing how he was prejudiced (*People v. Carr* (1989), 188 Ill. App. 3d 458, 544 N.E.2d 978), by explaining how earlier disclosure "would have altered [his] trial strategy and possibly changed the outcome of this case." (*Cisewski*, 118 Ill. 2d at 173.) A reviewing court determining prejudice may consider, among other factors, "the closeness of the evidence *** and the likelihood that prior notice could have helped the defense discredit the evidence." *Cisewski*, 118 Ill. 2d at 172.

We do not believe any other judgment would have been justified under the evidence. Indeed, the defendant's own testimony established that he beat Armstrong in a jealous rage and did not establish any justification for the beating.

The defendant cites *People v. Aguilar* (1991), 218 Ill. App. 3d 1, 578 N.E.2d 109, in which the appellate court reversed a conviction after a bench trial because the State failed to provide the defendant

with notice that an informant had received cash payments from the police despite a defense discovery request for indications of bias or interest of any witness. The appellate court reasoned in part that the defendant might have asked for a jury trial if he had known of the evidence. Without expressing agreement or disagreement with *Aguilar*, we conclude that the case is factually distinguishable. The issue in *Aguilar* was whether the defendant had been entrapped. The evidence on the issue of entrapment was close. The evidence in this case is not close. If the defendant had been tried by a jury, as we have previously noted, he would not have been entitled to a second degree murder instruction.

Finally, we note that the defendant himself brought out the statement made to Katz when he called Poli to testify to the conversations between the defendant and Katz. For these reasons, we conclude that no prejudicial error occurred in the admission of the statements made to Harris or to Katz. Before leaving this point, we wish to express our difficulty in understanding why the assistant State's Attorney who prepared Harris for trial did not recognize that his testimony was more damaging than what appeared in the police reports. The assistant State's Attorney should have recognized it and should have provided the information to the defendant before the trial began. And it is difficult for us to understand why the substance of the statement made by the defendant to Katz was not provided to the defendant before the trial began. Such failures to comply with the rules can only jeopardize otherwise proper convictions.

■ The defendant's next contention is that the judge improperly considered Armstrong's death when imposing sentence. We have examined the remarks of the trial judge before sentencing, and we conclude that he considered all of the proper factors in mitigation and aggravation. The case cited by the defendant, *People v. Saldivar* (1986), 113 Ill. 2d 256, 497 N.E.2d 1138, does not support his claim that the judge abused his discretion. In *Saldivar* the supreme court reversed a sentence because the *sole* aggravating factor relied on by the trial judge was the death of the victim. We judge that no error occurred in the sentencing. See *People v. Moore* (1988), 178 Ill. App. 3d 531, 533 N.E.2d 463.

The defendant's last contention is that error occurred at the sentencing hearing. Bellwood police officer Horsemann testified that on March 31, 1988, he interviewed the defendant's wife, Mary Burts. Mary told him that the defendant came home at approximately 3 a.m. on March 31, 1988, and they began arguing. The argument escalated and the defendant struck Mary in the face and chest. Mary told Horsemann that this was not the first time the defendant had

hit her. Mary signed a complaint against the defendant, and a warrant for his arrest was issued. Mary did not come to court and the charge was stricken with leave to reinstate. The defendant's attorney cross-examined Horsemann. The defendant now contends that the testimony was improperly considered by the trial judge because the defendant had never been convicted of any crime involving Mary and because the testimony about Mary's accusations was hearsay.

The trial judge correctly noted that a judge has very wide discretion regarding the admission of evidence at sentencing hearings, and his decisions are not governed by "the restrictive rules of evidence in effect at the guilt phase of the trial." (*People v. Johnson* (1986), 114 Ill. 2d 170, 205, 499 N.E.2d 1355.) Therefore, the admission of hearsay is not *per se* error in a sentencing hearing. (*People v. Foster* (1987), 119 Ill. 2d 69, 518 N.E.2d 82.) In 1981, the supreme court clarified the law and stated that evidence of crimes for which the defendant was never convicted will be admissible at a sentencing hearing if the evidence is relevant and reliable. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344.) The court explained that the rule is particularly applicable where the defendant does not dispute the accuracy of the accusations. *La Pointe*, 88 Ill. 2d at 489; see also *Johnson*, 114 Ill. 2d at 206.

The defendant relies on *People v. Crews* (1967), 38 Ill. 2d 331, 231 N.E.2d 451. In *Crews*, which was decided before *La Pointe* and *Johnson*, the supreme court held that the trial judge erroneously considered a case worker's report detailing the victim's stepbrother's statements to a foster mother. The report explained that the stepbrother, who was 4½ years old when he made the statements, told a foster mother that the defendant, his adopted mother, mistreated the victim several times before eventually killing the victim. The trial judge read the report into the record, but the caseworker, foster mother, and stepbrother were not called to testify. The defendant denied the allegations in the report. When sentencing, the trial judge placed great emphasis on the report.

The supreme court held that this emphasis on denied allegations was error for several reasons. First, there was no attempt to show that the 4½ year old was capable of reliably explaining events. Also, there was no chance for the defendant to cross-examine any of the parties to the report, and no indication the trial judge ever observed any of these parties. Therefore, the supreme court vacated the defendant's sentence. (See also *People v. Harris* (1989), 129 Ill. 2d 123, 544 N.E.2d 357 (trial judge erred in sentencing when he placed great emphasis on a denied charge which the State later dismissed because

it determined the defendant was not the offender).) In the case before us, the defendant's attorney did cross-examine the police officer, and the defendant did not deny the statement made by his wife.

■ We agree with the State that *People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612, is controlling. In *Richardson* the trial judge admitted evidence of seven alleged offenses by the defendant which did not result in convictions. Police officers who interviewed the complaining witnesses for four of these offenses testified and were subject to cross-examination. The complaining witnesses did not testify. The supreme court rejected the defendant's claim that admission of this hearsay was an abuse of discretion. The court held that the testimony was relevant to the defendant's criminal history and was reliable because the officers were cross-examined. Contrary to the defendant's assertion here, the supreme court in *Richardson* did not rest its holding on a harmless error analysis, but after holding that the judge did not abuse his discretion when considering the evidence, mentioned that, in any event, any possible error was harmless.

Another case which supports the State's position is *People v. Foster* (1987), 119 Ill. 2d 69, 518 N.E.2d 82. The trial judge admitted testimony by a police officer that, one day before the murder for which the defendant was being sentenced, he tied a woman with an electrical cord, beat her with a stick, and kicked her in the face. The defendant was never prosecuted for these acts, and the complainant was not called to testify at the sentencing hearing. Nevertheless, the defendant did not deny the allegations at the hearing, but only objected to the hearsay character of the testimony. The supreme court held that the trial judge did not abuse his discretion by admitting the officer's testimony. The court stressed that the officer compiled the evidence in the course of an official investigation and that the defendant did not challenge the information's accuracy. We conclude, therefore, that no error occurred at the sentencing hearing.

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA, P.J., and RAKOWSKI, J., concur.