NOTICE
Decision filed 05/26/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 160345-U

NO. 5-16-0345

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Massac County. |
| | ) | |
| v. | ) | No. 12-CF-29 |
| | ) | |
| MICHAEL D. THOMPKINS, | ) | Honorable |
| | ) | Joseph Jackson, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Justices Cates and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: The defendant did not receive ineffective assistance where counsel unsuccessfully sought a second-degree murder instruction based on an assertion that the defendant acted under a sudden and intense passion after witnessing his former girlfriend engaging in intimacy with another man. The evidence was sufficient to prove beyond a reasonable doubt that the defendant intended to kill his former girlfriend when he forced his way into a locked room and attempted to stab her. The court's failure to give a modified jury instruction informing jurors that the defendant could not be found guilty of attempted murder unless he had the specific intent to kill his former girlfriend did not rise to the level of plain error, and counsel's failure to request a modified instruction did not constitute ineffective assistance.

¶ 2    The defendant, Michael Thompkins, broke into the home of his former girlfriend,

Jessica Horn, and stabbed Horn and her boyfriend, Jackie LaShaun Blake, after witnessing

1

Horn and Blake engaging in sex. Blake died of his injuries. At trial, defense counsel attempted to show that the defendant was guilty of second-degree murder, rather than first-degree murder, because he acted under a sudden and intense passion due to serious provocation. See 720 ILCS 5/9-2(a)(1) (West 2010). He did not raise any other defenses. The defendant appeals his convictions for first-degree murder and attempted first-degree murder, arguing that (1) he received ineffective assistance of counsel due to counsel's reliance on a theory of second-degree murder that was not sound; (2) there was insufficient evidence to prove beyond a reasonable doubt that he intended to kill Horn, which is a necessary element of attempted murder; and (3) the court erred in failing to instruct jurors that to find him guilty of attempt, they must find that he specifically intended to kill Horn. We affirm.

¶ 3     The defendant and Horn began dating sometime late in 2008 and moved in together shortly thereafter. Their daughter, Ja'Chel, was born in January 2010. In June 2010, Horn moved out of the apartment she shared with the defendant, but their dating relationship did not end until approximately September 2011. The events at issue in this case took place in March 2012. By that time, Horn was in a relationship with Jackie LaShaun Blake, better known as Shaun Blake. The defendant and Horn had no contact with each other for several months prior to March 2012; however, early that month, they began communicating again through Facebook messages, text messages, and phone calls. Most of their discussions focused on arranging an opportunity for the defendant to see Ja'Chel.

¶ 4     During the early morning hours of March 25, 2012, the defendant went to Horn's apartment. He later claimed in a letter to Horn that he went there to see if she still lived

there because she told him she moved. Horn was not home when the defendant arrived. He waited outside the apartment for her to return. When Horn returned home with Blake, the defendant saw them get out of a vehicle and enter the apartment together. The defendant walked away to smoke a cigarette. He then walked back to the apartment, looked in the window, and saw Horn and Blake having sex on the sofa. Upon seeing this, the defendant became enraged. He used the metal pole from a nearby street sign to break a window in the kitchen door and enter the apartment. Once inside, he used a kitchen knife and a barbecue fork to stab Blake and Horn. Blake died as a result of his injuries.

¶ 5    The defendant was arrested later that day. He was charged with home invasion (720 ILCS 5/12-11(a)(2) (West 2010)), first-degree murder (*id.* § 9-1(a)), and attempted first-degree murder (*id.* §§ 8-4(a), 9-1(a)(1)). The defendant initially pled guilty. However, he subsequently filed a motion to withdraw his plea. The trial court denied the motion, finding it to be untimely. The defendant filed a postconviction petition, asserting that he received ineffective assistance of plea counsel. After a hearing, the postconviction court allowed the defendant to withdraw his plea, finding that plea counsel had a conflict of interest. The matter proceeded to trial.

¶ 6    During discovery, defense counsel indicated that he intended to raise the issue of second-degree murder based on a sudden and intense passion resulting from serious provocation. See *id.* § 9-2(a)(1)). As we will discuss in more detail later, there were two hurdles the defense had to overcome in order to prevail on this theory. First, second-degree murder based on serious provocation due to witnessing a partner's infidelity has not previously been applied in the context of nonmarital romantic relationships in Illinois (see

3

*People v. Yarbrough*, 269 Ill. App. 3d 96, 102 (1994)), although the Illinois Supreme Court has suggested that it might be appropriate to expand this rule to apply to marriage-like relationships (see *People v. McCarthy*, 132 Ill. 2d 331, 341 (1989)). Second, the infidelity-as-provocation rule does not apply even to marriages that have ended. See *McCarthy*, 132 Ill. 2d at 342; *People v. Elder*, 219 Ill. App. 3d 223, 229 (1991).

¶ 7    The State filed a motion *in limine* seeking to admit into evidence an order of protection obtained by Horn against the defendant. The court heard arguments on that motion at a hearing shortly before trial. The prosecutor argued that the order of protection would be relevant to negate the defendant's claim of second-degree murder because it would demonstrate that the defendant and Horn were no longer in a dating relationship. He further argued that it "could be considered by the jury to determine if he was acting as a reasonable person." He indicated that he intended to argue that the infidelity-as-provocation rule was inapplicable *both* because the relationship was over *and* because Horn and the defendant were never married.

¶ 8    Defense counsel argued that the order of protection would not prove that the relationship had terminated because the defendant and Horn reconnected after it was entered. He further argued that it was too prejudicial. In response to the prosecutor's argument that the infidelity-as-provocation rule was not applicable to couples who never married, counsel pointed out that the defendant and Horn lived together and had a child together. He stated, "I would say that the issue's been in front of" appellate courts, but "they've always side-stepped it."

4

¶ 9    The court ruled that the order of protection would be relevant and admissible only if the defendant testified "to extreme provocation." The court directed the prosecutor to raise the issue out of the presence of the jury if and when it became relevant, noting that the court would need to determine at that point whether the potential prejudice from admission of the order outweighed its probative value. The court was not asked to address the question of whether it was amenable to expanding the infidelity-as-provocation rule to a marriage-like relationship if the defendant could establish that his relationship with Horn had been rekindled.

¶ 10   At trial, defense counsel began his opening statement, saying, "Who, what, when, where, how, and then why. The 'why' is the driving factor behind what human beings do in their daily lives, and that 'why' is what this case is all about." Counsel went on to tell jurors that the evidence would show that the defendant and Jessica Horn fell in love, moved in together, and had a daughter. He told them that even after the defendant and Horn stopped living together, they "provided for each other" and "loved each other." He stated that the evidence would show that although the defendant and Horn had a "falling out" at some point, they "reconnected" in March 2012. He told jurors that the defendant and Horn met in a park shortly before the events at issue occurred, where they kissed, held hands, and discussed getting back together. Counsel told jurors that the defendant went to Horn's apartment on March 25, 2012, to see his daughter, but when he looked in the window, he saw Horn having sex with Blake. Counsel argued that upon seeing this, the defendant acted out of a "sudden and intense passion." He concluded by urging jurors to find the defendant not guilty of first-degree murder and to find him guilty of second-degree murder instead.

¶ 11 Jessica Horn testified that in March 2012, she lived in an apartment with her boyfriend, Shaun Blake, and her daughter, Ja'Chel. On the evening of March 24, Ja'Chel was staying with Horn's mother. Horn and Blake went out to a bar. She estimated that they returned home shortly after 2:00 on the morning of March 25. Horn testified that when they first got home, she and Blake had something to eat and watched television. Later, they were about to have sex, when they heard a "very loud crashing sound." Horn testified that she grabbed her cell phone so she could call 9-1-1. Then, she and Blake locked themselves in the bathroom.

¶ 12 Horn testified that the intruder—whom she later identified as the defendant— banged on the bathroom door in an effort to gain entry. Horn stood in front of the bathroom door, attempting to block it with her body, but eventually the defendant was able to push the door halfway open. As the defendant stood in the doorway, attempting to force his way into the bathroom, he and Blake began punching each other. Meanwhile, the defendant continued to push against the door while Horn continued to push back. During these struggles, Horn was hit in the face with an object. She could see the defendant holding an object, which she thought looked like a crowbar. She testified that he was using the object to attempt to pry open the bathroom door.

¶ 13 Eventually, the defendant backed away and left the bathroom. At this point, Horn noticed that her face was injured. She testified that she could hear the defendant rummaging around in the kitchen. He then returned and began banging on the bathroom door again with what Horn believed was a crowbar. She testified that the defendant made a hole through the door, cutting her leg in the process. She further testified that the defendant

6

swung the crowbar-like object through the hole, nearly striking her head a second time. Eventually, the defendant "broke the door" and entered the bathroom.

¶ 14    Horn testified that Blake punched the defendant. The defendant, now armed with a knife, began stabbing Blake. Horn testified that he stabbed Blake first in the chest and then in the neck. When the defendant stabbed Blake in the neck, Blake suddenly stopped talking and fighting.

¶ 15    Horn further testified that she saw a broken knife on the floor. She reached for it, but the defendant stepped on her hand. She testified that the defendant was holding "one of those barbecue forks, one of those really long ones." She begged him not to kill her, telling him, "Please, just think about Ja'Chel." She testified that the defendant attempted to stab her with the barbecue fork, but she caught his hand. The defendant dropped the barbecue fork and walked out. Horn then called 9-1-1.

¶ 16    Horn was asked about the nature of her relationship with the defendant. She testified that they were never married or engaged, but they did once discuss marriage. She could not remember when that discussion occurred, but she thought it was before 2012. She noted that their relationship ended sometime around September 2011.

¶ 17    The prosecutor also asked Horn if she could identify the handwriting in two letters that were admitted into evidence later in the trial. The two letters were written by the defendant while he was in jail awaiting trial. One letter was written to Horn, and the other was written to the defendant's mother. In both letters, the defendant explained why he stabbed Horn and Blake. Significantly, in the letter to Horn, the defendant acknowledged

7

being aware that his relationship with her was over, and in the letter to his mother, he admitted that he intended to kill Horn.

¶ 18    Defense counsel objected to the introduction of these letters, noting that he was renewing an objection he made in a pretrial motion. Counsel raised three issues. First, he argued that because the letters were photocopies of the original letters, they did not comply with the "best evidence" rule. Second, he argued that the letters were not collected and copied in compliance with the County Jail Standards Act. Third, he argued that laying a proper foundation for the letters required the testimony of jail personnel about the collection and reproduction of the letters. The prosecutor indicated that he intended to call another witness to testify about the collection and reproduction of the letters, and he did not intend to offer them into evidence until that time. The court overruled the defendant's objection. Horn testified that she recognized the handwriting in the letters as the defendant's handwriting.

¶ 19    On cross-examination, Horn was asked about the state of her relationship with the defendant in the weeks leading up to the events at issue. She testified that she had regular contact with the defendant during the month of March 2012, although she had not had any contact with him for several months prior to that. Horn explained that in March 2012, she communicated with the defendant mainly by phone, text messages, and Facebook Messenger. On one occasion, however, they met in a park. At that meeting, the defendant gave Horn a present for their daughter, Ja'Chel. Horn denied that she and the defendant kissed or held hands during that meeting.

¶ 20    Horn was also asked about her relationship with Blake. She acknowledged that she sent her sister a text message in February 2012 telling her about a rumor that Blake may have been unfaithful to Horn. However, she testified that she believed Blake when he denied that rumor. Horn admitted that she accused Blake of being unfaithful in text messages later in March. She also admitted telling him to get his clothes out of her apartment during an argument; however, she testified that she said this in anger and did not really want Blake to move out.

¶ 21    Finally, Horn testified that the defendant knew about her relationship with Blake. Although she could not recall whether she told him about Blake in a text message or phone call, she was sure she did tell him about Blake prior to the events at issue occurring. A printout of some of the messages exchanged between Horn and the defendant was entered into evidence. Most of those messages were about their daughter, Ja'Chel. However, other messages involved friendly discussions of other topics.

¶ 22    The State called Massac County jail administrator John Konemann to the stand to finish laying the foundation for admission of the defendant's letters to his mother and Horn. Konemann testified that one of his duties as jail administrator was processing inmates' mail. He explained the mail procedures as follows: Inmates slide out-going letters under their cell doors for collection. Inmates address the envelopes themselves; however, apart from letters that are subject to attorney-client privilege, they must leave the envelopes unsealed. Konemann testified that two letters were collected from the defendant in September 2012 using this process. When Konemann received these letters, he made

photocopies, which he provided to one of the investigating officers. He did not know what happened to the original letters.

¶ 23 On cross-examination, Konemann acknowledged that he did not personally collect the letters from the defendant's cell. He further acknowledged that he also did not witness the letters being collected. Konemann testified that he did not know how many cellmates the defendant had at the time, but he believed there were "maybe two."

¶ 24 The State moved to admit the copies of the defendant's letters into evidence. Defense counsel renewed his objection. He argued that that State had not laid a sufficient foundation because Konemann did not personally see the letters being taken from the defendant's jail cell. The State argued that Horn's testimony that she recognized the defendant's handwriting coupled with Konemann's testimony about the circumstances of the collection of the letters was sufficient to demonstrate that the letters were written by the defendant. In response, the defense argued that the State did not establish that Horn was familiar enough with the defendant's handwriting to recognize it. The court noted that Horn was subject to cross-examination on that point. The court therefore ruled that the State laid a sufficient foundation and admitted the letters into evidence.

¶ 25 In the letter to Horn, the defendant wrote, "Can I start by saying I am really very sorry for what I did to you and him. I know you would like to know why." He went on to tell Horn that he wanted to work on getting "back together" with her as a couple, but he eventually realized that would not happen. He decided to focus on being able to spend time with his daughter. He wrote, "I had to try to deal with you been [*sic*] with someone else. Then I got to deal with my daughter been [*sic*] around another man."

¶ 26 The defendant then wrote about the events of March 25, 2012. He told Horn that he was depressed because he knew that he could not get back together with her, but he was "cool with that." He explained that he went to Horn's apartment that night to see if she was still living there because she had told him that she had moved. The defendant told Horn that when he saw her pull up in a car with another man, his "heart and soul dropped." He told her that when he looked into her apartment and saw her having sex with Blake, he "really lost it." He continued, "But when I lost it and I come into your apartment, the only thing that made me come back was when you said, 'Think about Chel.' "

¶ 27 In the letter to his mother, the defendant gave the same explanation for his visit to Horn's apartment that he gave to Horn. He told his mother that he saw Horn arrive home with another man, and he then looked in the window and saw them having sex. He admitted to his mother that he broke into Horn's apartment. He further admitted that he managed to get into the bathroom, where Horn and Blake had barricaded themselves. The defendant told his mother that he got into a fight with Blake. He wrote, "Then I got a barbecue fork to kill her with. The only thing that stop me from kill her [*sic*] was she told me to think about Chel, and my mind came back." Finally, the defendant told his mother that he still loved Horn.

¶ 28 Dr. John Allen Heidingsfelder, the forensic pathologist who performed an autopsy on Blake, testified that he found stab wounds to the right base of Blake's neck and the top of his left shoulder. In addition, he found abrasions on Blake's back and chest, and a small, superficial cutting wound on the top of his right shoulder. Dr. Heidingsfelder did not observe any evidence of defensive injuries to Blake's hands. He testified that the stab

11

wound to the base of Blake's neck extended into his chest. The wound cut through two major blood vessels and into the trachea. Dr. Heidingsfelder opined that the cause of Blake's death was external hemorrhage and endobronchial hemorrhage resulting from the stab wound to the base of his neck.

¶ 29   Deputy Clayton Penrod and Sgt. Cody Brown were the first officers to respond to the scene. Both described the condition of Horn's apartment in their trial testimony. Deputy Penrod testified that the window on the kitchen door was shattered and the kitchen was disheveled, with items strewn around the room. He observed a metal pole lying on the kitchen floor. When Deputy Penrod entered the bathroom, he found Blake slumped over the bathtub, breathing but not responsive. The bathroom floor was covered in blood. Sgt. Brown's description of the kitchen was consistent with that of Deputy Penrod. However, he made two additional observations. He testified that the kitchen drawers were open and that there was a "bloody footwear impression" on the kitchen floor. Sgt. Brown further testified that when he questioned Horn, she showed him a two-pronged grilling utensil and told him that it was one of the weapons used in the attack. He further testified that Horn was able to identify the defendant as her assailant.

¶ 30   Forensic evidence against the defendant included the bloody footprint found on the kitchen floor, a bloody palm print found on the bathroom door, and deoxyribonucleic acid (DNA) analysis of blood found on the defendant's clothing, on the knife and barbecue fork used in the stabbings, and in the apartment. Forensic scientist Lisa O'Daniel, whose specialty is footwear and fingerprint identification, compared a gelatin lift of the bloody

12

footprint with the defendant's left shoe. She determined that the footprint was made by that shoe. O'Daniel also identified the palm print as the defendant's print.

¶ 31    DNA analyst Eric Corey analyzed several bloodstains found on the defendant's clothing. He found blood that matched the DNA profiles of Horn, Blake, and the defendant. Corey also tested three swabs of blood from bloody footprints found on the floor of the apartment. The first two samples matched Blake's DNA profile. The third was a mixture of two DNA profiles. The major profile matched Blake's DNA profile. The minor profile was not complete and therefore did not constitute a match; however, Horn could not be excluded. Finally, Corey conducted DNA analysis of the blood found on the barbecue fork and the knife. The blood on the barbecue fork matched Horn's DNA profile. The blood on the knife contained a mixed DNA profile. Neither profile was complete, but both Horn and Blake could not be excluded.

¶ 32    During the jury instructions conference, the defendant tendered an instruction on second-degree murder. The State objected. The prosecutor argued that infidelity as the basis for a finding of serious provocation has never previously been recognized in the context of a nonmarital romantic relationship. He acknowledged, however, that "cases do suggest or reference a nonmarital relationship." He further argued that the evidence in this case showed that the defendant's romantic relationship with Horn ended before the events at issue took place. Defense counsel argued that Illinois appellate courts previously declined to decide whether the infidelity-as-provocation rule should be extended to include nonmarital relationships. He further argued that there was evidence that the parties

13

discussed marriage shortly before the stabbings, which demonstrated that the relationship had resumed. The court refused the instruction.

¶ 33    The prosecutor began the State's closing argument by telling the jurors that the State had proven its case. He reviewed Horn's account of the events. He argued that her testimony was confirmed by the forensic evidence and by the defendant's letters. The prosecutor went on to discuss the elements of the offenses charged. In discussing the elements of attempted first-degree murder, he told jurors that the State must prove that the defendant committed an act which constituted a substantial step in the killing of an individual and that he "did so with the intent to kill an individual." He argued, "The defendant's behavior shows that he intended to kill Jessica." In support of this argument, the prosecutor emphasized the defendant's statements in his letter to his mother, and he highlighted the evidence that the defendant found multiple items to use as weapons.

¶ 34    In the defendant's closing argument, defense counsel reminded jurors that in his opening statement, he "stressed the importance of the why, the why of this case." He argued, "The why of this case is what Michael was feeling on the night of March 25, 2012, and the cause of those feelings." Counsel reminded jurors that the defendant, Horn, and their daughter once lived together as a family. He highlighted the evidence that contact between the defendant and Horn increased during March of 2012 and argued that during the same period, Horn's relationship with Blake was deteriorating.

¶ 35    Counsel argued that when the defendant went to Horn's apartment that night, he did not intend to break into the apartment, and he did not intend to harm anyone. He emphasized that the defendant did not carry with him any weapons or any tools to use to

break in. Instead, he had to improvise with items he found at the scene. Counsel told jurors that the defendant's actions that night were "impromptu, spurred by what he saw in the window." He pointed to statements in the defendant's letters saying that he "lost it." He argued, "Seeing Jessica and Mr. Blake having sex on the couch caused a sudden, intense passion inside him." Counsel urged jurors to return verdicts of not guilty.

¶ 36    During deliberations, the jury sent a note to the court, asking for clarification on the charge of attempted murder. The note read, "Is that charge specific to his assault on Jessica Horn and only Jessica Horn as opposed to including his actions against Shaun Blake?" The court sent a reply, stating, "Yes. The Defendant can only be convicted of the attempt first-degree murder of Jessica Horn. All evidence presented can be considered in reaching your verdict." The jury later sent a second note to the court, asking to see the letters the defendant wrote to his mother and Horn. The note indicated that the jury wanted to see the copies of the letters "in review of attempt with intent." The court sent the letters to the jury room.

¶ 37    The jury returned verdicts of guilty on all three charges. The defendant filed a motion for a new trial, arguing that the court erred in refusing his tendered second-degree murder instruction. The court denied the motion. The court sentenced the defendant to consecutive terms of 60 years for first-degree murder and 25 years for attempted first-degree murder. It found that the home invasion charge merged with the first-degree murder charge and therefore imposed no sentence on that charge. This appeal followed.

¶ 38    The defendant first argues that counsel provided ineffective assistance because he offered no defense other than the partial defense of sudden and intense passion arising from

15

serious provocation, a theory of second-degree murder he should have known was not viable. We are not persuaded.

¶ 39 We evaluate claims of ineffective assistance of counsel using the two-part test announced by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). Under that test, a defendant must demonstrate both that counsel's performance "fell below an objective standard of reasonableness" (*id*. at 687-88) and that he suffered prejudice as a result (*id*. at 693). To prove prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

¶ 40 The defendant argues that counsel's performance fell below an objective standard of reasonableness because he presented a theory of second-degree murder that was unsound. The defendant correctly notes that failure to understand the law can constitute deficient performance. See, *e.g.*, *People v. Patterson*, 192 Ill. 2d 93, 121 (2000). The defendant further argues that counsel's performance prejudiced him in two related ways. First, he argues that counsel hurt his case by implicitly promising jurors during opening statements that they would receive a second-degree murder instruction. He asserts that this created an expectation that was unfulfilled. He points out that when defense attorneys promise jurors that they will hear specific exculpatory evidence, particularly the defendant's own testimony, a failure to follow through on that promise can be detrimental to a defendant's case. See, *e.g.*, *People v. Winkfield*, 2015 IL App (1st) 130205, ¶ 21; *People v. Bryant*, 391 Ill. App. 3d 228, 243 (2009); *People v. Briones*, 352 Ill. App. 3d 913, 918 (2004). Second, the defendant argues that by urging jurors to find him guilty of second-

16

degree murder and not guilty of first-degree murder even though he was not entitled to a second-degree murder instruction, counsel effectively conceded his guilt and left jurors with no choice but to convict. See *People v. Chandler*, 129 Ill. 2d 233, 247 (1989); *People v. Hattery*, 109 Ill. 2d 449, 465 (1985). We do not believe the defendant can show either that counsel's performance was objectively unreasonable or that there was a reasonable probability of a different outcome.

¶ 41 Before addressing the defendant's arguments, it is worth emphasizing that the evidence of his guilt was overwhelming. The surviving victim, Jessica Horn, knew the defendant well, and she was thus easily able to identify him as her assailant. Horn's testimony about the attack was corroborated by forensic evidence, including DNA evidence. In addition, the defendant admitted in his letters that he stabbed Horn and Blake. The defendant correctly argues that, even in the face of such overwhelming evidence, he was entitled to "reasonably effective assistance" from his attorney. See *Chandler*, 129 Ill. 2d at 250. For the reasons that follow, we find that he received the reasonably effective assistance to which he was entitled.

¶ 42 We first reject the defendant's contention that counsel's performance was deficient because he misapprehended the law regarding the infidelity-as-provocation rule. The record indicates that counsel understood the applicable law. To understand why we reach this conclusion, an overview of the state of the law would be helpful.

¶ 43 Under section 9-2 of the Criminal Code of 1961, a defendant is guilty of second-degree murder, rather than first-degree murder, if one of the mitigating factors outlined in the statute is present. *People v. Burts*, 256 Ill. App. 3d 972, 976 (1993) (citing Ill. Rev.

17

Stat. 1989, ch. 38, ¶ 9-2 (now at 720 ILCS 5/9-2 (West 2012))). One of the mitigating factors is that the defendant acted under a " 'sudden and intense passion resulting from serious provocation by the individual killed.' " *Id*. at 976-77 (quoting Ill. Rev. Stat. 1989, ch. 38, ¶ 9-2(a)(1) (now at 720 ILCS 5/9-2(a)(1) (West 2012))). Under Illinois law, four types of conduct have been recognized as constituting "serious provocation": assault, mutual combat, illegal arrest, and adultery with the defendant's spouse. *People v. McCarthy*, 132 Ill. 2d 331, 340-41 (1989). However, serious provocation will only constitute a mitigating factor if the killing occurs almost immediately, before the defendant has had enough time to cool off. *People v. McDonald*, 63 Ill. App. 2d 475, 479 (1965). In the context of marital infidelity, this means that the killing must occur upon discovering the defendant's spouse in the act for the rule to apply. *Burts*, 256 Ill. App. 3d at 977 (quoting *People v. Chevalier*, 131 Ill. 2d 66, 72 (1989)). In addition, as we mentioned earlier, the rule does not apply in the context of marriages that have ended. *McCarthy*, 132 Ill. 2d at 342.

¶ 44    As we have already explained, infidelity as serious provocation has not previously been applied in Illinois in the context of a nonmarital romantic relationship. See *Yarbrough*, 269 Ill. App. 3d at 102. However, no Illinois court has definitively determined that the rule does *not* apply to such relationships.

¶ 45    As defense counsel pointed out in his arguments to the trial court, none of the Illinois appellate courts that have been presented with the question of expanding the serious provocation rule to nonmarital relationships have squarely addressed the question. This is

18

because in each of those cases, the court found the serious provocation rule to be inapplicable for other reasons. See *id*.

¶ 46    In *People v. McCarthy*, the Illinois Supreme Court found that the rule recognizing infidelity as serious provocation would not be applicable in the case before it even if the rule were expanded for two reasons. First, the relationship between the defendant and the victim ended two months before the murder. *McCarthy*, 132 Ill. 2d at 342. Second, the evidence showed that the defendant was stalking the victim during the two months between their break-up and the murder, and this evidence suggested that he intended to kill her for some time before the murder. *Id*. at 342-43. However, there was "no evidence, apart from the defendant's own testimony, that the defendant's actions were engendered by a sudden and intense passion." *Id*. at 342.

¶ 47    Prior to reaching this conclusion, the *McCarthy* court questioned whether there were valid public policy reasons to limit the infidelity-as-provocation rule to married couples. The court noted that this limitation had been questioned in other jurisdictions, " 'at least in cases where there existed a longstanding relationship comparable to that of husband and wife.' " *Id*. at 341 (quoting 2 W. LaFave & A. Scott, Substantive Criminal Law § 7.10, at 259 (1986)). The court reasoned that, "Many of the same reasons that warrant recognition of adultery with a spouse as sufficient provocation *** would also be applicable in the absences of a marital relationship." *Id*. The court also noted, however, that the fact that Illinois did not recognize common law marriages might provide a public policy rationale in favor of distinguishing between marriages and marriage-like relationships in the criminal context as well. *Id*. It is worth noting that Illinois now recognizes civil unions. See Pub.

19

Act 96-1513 (eff. June 1, 2011) (enacting the Illinois Religious Freedom Protection and Civil Union Act). The legislature's purpose in doing so is to provide individuals entering into civil unions with the same protections, benefits, and obligations recognized by law for married people. 750 ILCS 75/5 (West 2012). Thus, current public policy may provide less support for limiting the serious provocation instruction to married defendants than it did in 1989, when *McCarthy* was decided. As we have discussed, however, the *McCarthy* court did not resolve the question because it found the serious provocation rule inapplicable for other reasons. *McCarthy*, 132 Ill. 2d at 342.

¶ 48     After *McCarthy*, Illinois appellate courts continued to avoid squarely addressing the question of whether the rule should be expanded. In *Burts*, for example, the First District found it unnecessary to consider expanding the rule where the defendant committed the murder after he believed someone who told him that his partner had been unfaithful even though he did not witness any act of infidelity at all. *Burts*, 256 Ill. App. 3d at 977. In *Elder*, the Third District likewise declined to resolve the question, instead finding a second-degree murder instruction inapplicable both because the relationship ended before the murder and because the defendant's conduct indicated "that he was not suddenly provoked when he shot [the victim], but rather that he was completing a contemplated plan." *Elder*, 219 Ill. App. 3d at 229-30.

¶ 49     The only case we are aware of that might be read as rejecting outright the notion that the rule should be expanded to include unmarried couples is the First District's 1965 decision in *People v. McDonald*. There, the defendant had been living with his girlfriend for 25 years. He came home late one night to find her in the bedroom of their home with a

20

male visitor. *McDonald*, 63 Ill. App. 2d at 476. Both were fully clothed, and nothing in the opinion suggests that the defendant witnessed any sexual activity between them. *Id*. The man left the house, and the defendant's girlfriend told him to visit again. *Id*. The defendant went out drinking with friends for a few hours. When he returned home, he again encountered his girlfriend's visitor. This time, the man was walking out of the house as the defendant walked in. Again, there is no indication that the defendant witnessed any act of infidelity. *Id*. at 477. The defendant twice asked his girlfriend what was going on. Both times, she gave an answer that was unintelligible. He then shot and killed her. *Id*.

¶ 50    On appeal from his subsequent conviction for her murder, the defendant argued that he should have been convicted of voluntary manslaughter (now called second-degree murder) instead of murder. *Id*. at 476. In rejecting this argument, the appeals court first stated, "we do not think that the facts in evidence disclose the 'compromising situation' which defendant uses as the base for his argument." *Id*. at 480. The court went on to note, "we are aware of no case which applies the exculpatory features of [serious provocation] to the killing of a mistress, regardless of the duration of the relationship. We will not do so in this case." *Id*. This statement could be construed to mean *either* that the court would not apply the serious provocation rule in the case before it because the facts of the case did not warrant it *or* that the court would find the rule to be inapplicable to a nonmarital relationship regardless of the facts and circumstances of the case. To the extent the statement can be read as an outright rejection of expanding the rule to include nonmarital relationships, we believe this reasoning has been undermined to an extent by the supreme court's statements in its 1989 opinion in *McCarthy*. In this regard, it is worth noting that in

21

the years following the *McCarthy* decision, the First District, the court that decided *McDonald*, has treated the issue as an unresolved question. See, *e.g.*, *Yarbrough*, 269 Ill. App. 3d at 102; *Burts*, 256 Ill. App. 3d at 977.

¶ 51    As our review of the pertinent law reveals, the applicability of the infidelity-as-provocation rule to nonmarital relationships remains an unresolved question in Illinois. As such, the defendant's theory of second-degree murder was at least potentially viable. Counsel's arguments to the trial court demonstrate that he understood the state of the law on this question. As stated earlier, he specifically argued that appellate courts had "side-stepped" the issue. Moreover, we believe that, in the face of the overwhelming evidence of the defendant's guilt, counsel's efforts to prove that the relationship between the defendant and Horn had been rekindled and his good faith argument for an expansion of the serious provocation rule constituted sound trial strategy.

¶ 52    The defendant argues, however, that counsel should have obtained a definitive ruling on the question prior to relying on this theory of the case. We do not agree.

¶ 53    It is important to note that we must judge the reasonableness of counsel's performance within the context of the facts and circumstances of the case. *Strickland*, 466 U.S. at 690. There are two aspects of the facts and circumstance of this case that lead us to reject the defendant's contention.

¶ 54    First, we find that the court's ruling on the admissibility of the order of protection suggested that the trial judge was undecided on the applicability of a second-degree murder instruction, and that he was reserving ruling so that he could consider possible evidence that the defendant acted under a sudden and intense passion when he killed Blake and that

22

his relationship with Horn had been rekindled at the time of the murder. As discussed earlier, the State sought to admit the order of protection into evidence to demonstrate that the relationship between the defendant and Horn had ended, and the court found that the order of protection would be relevant if the defendant presented evidence of provocation. If the court had ruled out giving a second-degree murder instruction because the defendant never married Horn, the order of protection would not have been relevant under any circumstances. Thus, the court's willingness to consider this evidence prior to ruling suggests that the court considered the defendant's theory to be at least potentially viable.

¶ 55 Second, there was overwhelming evidence establishing that the defendant unjustifiably killed Blake, and there was substantial evidence to support his claim that he was arguably acting under a sudden and intense passion when he did so. Under these circumstances, pursuing a theory of second-degree murder based on serious provocation was the only strategy realistically available. Had counsel requested a definitive ruling before trial, as the defendant now claims he should have done, this strategy easily could have backfired. An adverse ruling at the outset would have deprived the defendant of his only realistic chance at avoiding a first-degree murder conviction. By following the strategy he did, counsel allowed the court to consider the question while he developed the evidence to support a second-degree murder instruction throughout the trial. We believe this constituted sound trial strategy.

¶ 56 In evaluating claims of ineffective assistance of counsel, we must also consider "the 'totality of counsel's conduct.' " *Winkfield*, 2015 IL App (1st) 130205, ¶ 24 (quoting *People v. Spann*, 332 Ill. App. 3d 425, 430 (2002)). Here, counsel did all he could to

provide factual support for the defense theory of second-degree murder. He cross-examined Horn extensively about the state of her relationships with both Blake and the defendant. In so doing so, he elicited admissions that Horn argued with Blake frequently during the weeks leading up to the stabbings. Significantly, Horn admitted to demanding that Blake take his clothes and move out, but she claimed that she only said this because she was angry and did not mean it. This admission may have helped to undermine the credibility of her testimony regarding the state of her relationship with the defendant. In addition, counsel objected strenuously to the introduction of the defendant's letters. He also successfully objected to the introduction into evidence of a third inculpatory statement made by the defendant. Viewing counsel's performance in its entirety and in the context of the facts and circumstances of the case, we find that he rendered the reasonably effective assistance to which the defendant was entitled.

¶ 57 Finally, in the face of the overwhelming evidence of his guilt, we do not believe that the defendant can show that there was a reasonable probability of a different outcome had counsel not pursued the strategy he did. On the contrary, we believe the absence of this strategy under the circumstances of this case would have led to an even higher probability of the same outcome. Although the defendant contends that he was prejudiced because counsel effectively conceded his guilt, we note that the Illinois Supreme Court has held that effectively conceding a client's guilt in the face of overwhelming evidence does not *per se* constitute ineffective assistance. *Chandler*, 129 Ill. 2d at 246. There is a substantial difference between the penalties available for first-degree murder and second-degree murder. First-degree murder carries a penalty of 20 to 60 years in prison, with an extended-

24

term sentencing range of 60 to 100 years, and the possibility of natural life in prison under certain circumstances. 730 ILCS 5/5-4.5-20(a) (West 2012). Second-degree murder is a class 1 felony (720 ILCS 5/9-2(d) (West 2012)) with a sentencing range of 4 to 20 years and an extended-term sentencing range of 15 to 30 years (730 ILCS 5/5-4.5-30(a) (West 2012)). Thus, the potential benefit to the defendant from counsel's efforts to secure a second-degree murder instruction was substantial. Compare *Chandler*, 129 Ill. 2d at 247 (finding counsel's representation deficient where his strategy could not have benefited the defendant even if he had been successful). The fact that his attempt was ultimately unsuccessful does not render his assistance ineffective. See *Strickland*, 466 U.S. at 689 (explaining that counsel's performance must be assessed without "the distorting effects of hindsight" after a strategy has turned out to be unsuccessful).

¶ 58 The defendant also contends that he was prejudiced by counsel's failure to deliver on a promise made to jurors in opening statements, the promise that they would receive a second-degree murder instruction. We find this argument unpersuasive. For one thing, the cases the defendant cites for the proposition that such "broken promises" are highly prejudicial involve dramatic promises of exculpatory evidence, including promises that the defendant would tell his story in his own words. See *Winkfield*, 2015 IL App (1st) 130205, ¶ 22 (counsel made an "explicit promise" of alibi testimony); *Bryant*, 391 Ill. App. 3d at 230 (counsel "set forth in detail what the defendants' testimony would purportedly establish"); *Briones*, 352 Ill. App. 3d at 918 (counsel promised "that the defendant would testify to the truth"). The instant case involves no such dramatic promise, even assuming counsel's opening statement can be construed as an implicit promise at all. More

25

fundamentally, however, we believe that a different result is inconceivable in light of the evidence presented.

¶ 59    It is worth noting that, although the defendant does not focus on this aspect of the opening statement, counsel did explicitly tell jurors that they would hear evidence that the defendant and Horn kissed, held hands, and discussed getting back together. Counsel attempted to elicit this evidence during his cross-examination of Horn, but her testimony did not support his prediction. In *Winkfield*, defense counsel told jurors that multiple witnesses would testify that the defendant had an alibi, but most of those witnesses did not testify (*Winkfield*, 2015 IL App (1st) 130205, ¶¶ 22-23), and the testimony of another witness did not support counsel's prediction of an alibi (*id*. ¶ 26). In rejecting the defendant's claim of ineffective assistance of counsel, the appellate court noted that the record did not reveal whether counsel's inability to present the other alibi witnesses was due to a deficiency in his performance or unforeseen circumstances, such as the witnesses' refusal to cooperate. *Id*. ¶ 27. The court concluded that it could not evaluate counsel's representation on the incomplete record before it and explained that postconviction proceedings would therefore be a more appropriate avenue for addressing the defendant's claim. *Id*. ¶¶ 27-28. Here, the record is similarly silent as to the reasons counsel was unable to provide evidence to support his assertion. Moreover, as we have already discussed, counsel did not explicitly promise jurors that they would hear dramatic exculpatory evidence, and the evidence of the defendant's guilt was so overwhelming that we do not believe it is possible for him to demonstrate a reasonable likelihood of a different outcome. For these reasons, we reject his claim of ineffective assistance of counsel.

26

¶ 60    The defendant's next contention is that the evidence was insufficient to support his conviction for attempted first-degree murder because the State did not prove beyond a reasonable doubt that he intended to kill Jessica Horn. We disagree.

¶ 61    In an appeal challenging the sufficiency of the evidence, the question before this court is whether any rational trier of fact could have found all of the essential elements of the offense charged beyond a reasonable doubt. *People v. Brown*, 2015 IL App (1st) 131873, ¶ 12. In answering this question, we consider the evidence in the light most favorable to the prosecution. We also recognize that the credibility of witnesses and the reasonable inferences to be drawn from the evidence are decisions to be made by the jurors, not by this court. *Id*. We will not reverse a conviction based on insufficient evidence unless we find that "the evidence is so unreasonable, improbable, or unsatisfactory" that it creates a reasonable doubt as to the defendant's guilt. *Id*.

¶ 62    In order to prove the defendant guilty of attempted first-degree murder, the State must prove two things. First, the State must prove that the defendant committed an act which constituted a substantial step towards murdering an individual. *People v. Garrett*, 216 Ill. App. 3d 348, 353 (1991). Second, the State must also prove that the defendant acted with the specific intent to kill that individual. *Brown*, 2015 IL App (1st)131873, ¶ 14; *Garrett*, 216 Ill. App. 3d at 353. The State is, of course, required to prove each of these elements beyond a reasonable doubt. *Brown*, 2015 IL App (1st) 131873, ¶ 12. Here, only the element of the defendant's intent is at issue.

¶ 63    Intent can be inferred from the circumstances, including the nature of the assault or the use of a deadly weapon. *Id*. ¶ 14. Circumstances such as a brutal assault or life-

27

threatening injuries are often indicative of a specific intent to kill an individual. See *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 66. However, an intent to inflict great bodily harm is not sufficient to support a conviction for attempted first-degree murder. *People v. Jones*, 184 Ill. App. 3d 412, 429 (1989). As such, an assault resulting in serious bodily harm will not always support the finding of intent necessary to sustain a conviction for attempted murder. *Id*. at 429-30. Further, in a case involving multiple victims, evidence of the defendant's intent must be viewed independently as to each victim. *Garrett*, 216 Ill. App. 3d at 353. Whether a defendant acted with the requisite intent to kill a specific victim is a question for the jury, as trier of fact. We will not overturn its determination on this question "unless it clearly appears that there is reasonable doubt on the issue." *Brown*, 2015 IL App (1st) 131873, ¶ 14.

¶ 64    In support of his contention that the evidence in this case is not sufficient to prove that he acted with the specific intent to kill Horn, the defendant calls our attention to three cases in which appellate courts found the evidence insufficient to support a finding of intent. We find all three cases distinguishable.

¶ 65    The first case cited by the defendant is *People v. Thomas*, 127 Ill. App. 2d 444 (1970). There, the defendant was convicted of attempted first-degree murder, aggravated battery, rape, and robbery. He received separate sentences on all four charges. *Id*. at 455. During the assault that formed the basis for the charges, the defendant "pick[ed] at" the victim's face with a knife. *Id*. at 447. He inflicted multiple wounds in this manner. He also hit the victim's head against a chest of drawers. *Id*. at 455. The assault went on for 45 minutes. *Id*. at 454.

28

¶ 66    On appeal, the defendant argued that the evidence was insufficient to prove he was the assailant. *Id*. at 445. After rejecting this claim, the First District Appellate Court went on to consider the propriety of separate sentences on all four charges because much of the same conduct was involved in each of the charges. *Id*. at 455. In relevant part, the court found that separate sentences on the charges of attempted murder and aggravated battery could not stand because the charges were based on the same conduct. The court explained that ordinarily, this would require it to vacate the defendant's conviction for the less serious of the two charges—aggravated battery—while affirming his conviction for the more serious charge—attempted murder. *Id*. The court found, however, that the evidence was not sufficient to prove that the defendant had the requisite intent for the attempt charge. This was so, the court explained, because "the opportunity for murder was such that there was insufficient proof that the defendant intended or attempted to commit that crime." *Id*. at 456. The court therefore reversed the attempt conviction and affirmed his other convictions. *Id*.

¶ 67    Although the *Thomas* court did not elaborate further on its reasons for reaching this conclusion, subsequent First District decisions have offered additional insight. In *People v. Viramontes*, the court explained that "the prolonged nature of the attack" involved in *Thomas* provided the defendant with " 'the opportunity for murder.' " *Viramontes*, 2017 IL App (1st) 142085, ¶ 55 (quoting *Thomas*, 127 Ill. App. 2d at 456). In *People v. Scott*, the court observed that although the defendant in *Thomas* was armed with a knife when he committed the crimes, he did not use it to stab the victim. *People v. Scott*, 271 Ill. App. 3d 307, 311 (1994). We note that, although the *Scott* court stated that the defendant in *Thomas*

did not use his knife (*Scott*, 271 Ill. App. 3d at 311), as we have just discussed, he did, in fact, use the knife to "pick at" the victim's face (*Thomas*, 127 Ill. App. 2d at 447). Significantly, however, the defendant in *Thomas* did not use the knife "in a deadly fashion." See *Viramontes*, 2017 IL App (1st) 142085, ¶ 65 (making this distinction while discussing other cases). The *Scott* court explained that the *Thomas* court "reasoned that because the defendant had both opportunity and means to kill, but did not, the State did not establish specific intent to kill." *Scott*, 271 Ill. App. 3d at 311.

¶ 68　　The second case relied upon by the defendant is *People v. Jones*. That case involved assaults on a family of three. The defendants verbally threatened to kill one of the victims while one defendant struck him in the head with a gun and the other defendant repeatedly kicked him. *Jones*, 184 Ill. App. 3d at 430. The appellate court found that the defendants' verbal threats and the serious injuries suffered by the victim did not give rise to "an inference of an intent to kill" under the circumstances of the case. *Id*. In reaching this conclusion, the court emphasized that, although the defendants were armed with a knife and a gun, respectively, they did not stab or shoot the victim. As such, the court concluded that the evidence was insufficient to prove beyond a reasonable doubt that either defendant possessed the specific intent to kill. *Id*.; see also *Garrett*, 216 Ill. App. 3d at 354 (finding insufficient evidence of an intent to kill where an armed defendant assaulted the victim without using the weapon).

¶ 69　　The third case relied on by the defendant is *People v. Brown*. That case involved a domestic battery that occurred after the defendant's girlfriend asked him to move out of her apartment. *Brown*, 2015 IL App (1st) 131873, ¶ 3. This discussion took place early in

the morning, while the girlfriend was getting ready to go to work. As she was walking out of the bedroom, she felt pressure in her back and a sensation that felt like "punching." *Id.* ¶ 16. Shortly thereafter, she felt moisture dripping down her back, and she noticed that she was bleeding. *Id.* ¶ 3. As a result of the assault, the defendant's girlfriend was treated at a hospital for four lacerations on her back. *Id.* ¶ 5. Although the lacerations "penetrated the skin as well as some of the deeper tissues," there was no damage to "deeper underlying structures." *Id.* Her treating physician described her wounds as "superficial and not life threatening." *Id.*

¶ 70    After a bench trial, the defendant was found guilty of attempted first-degree murder. *Id.* ¶ 1. On appeal, he argued that the evidence was insufficient to prove that he acted with the specific intent to kill his girlfriend. *Id.* ¶ 10. He emphasized that her wounds were not life-threatening. He asserted that he stopped stabbing her "even though she was neither dead nor dying," and he argued that this act was "inconsistent with a specific intent to kill." *Id.* The appellate court agreed. In doing so, the court noted that the defendant did not threaten his girlfriend or engage in a struggle with her, either before or after he cut her back. *Id.* ¶ 16. The court also considered the fact that the victim's wounds were not deep as well as her testimony that during the attack, she felt only pressure in her back, not pain. *Id.* Finally, the court found it significant that when the victim "left the apartment, there was no evidence that the defendant attempted to pursue her or cause her any further injury." *Id.* For these reasons, the court did not find the evidence sufficient to establish the requisite intent to kill beyond a reasonable doubt. *Id.* ¶ 17.

31

¶ 71    The defendant argues that here, as in *Thomas*, *Jones*, and *Brown*, the evidence showed that Horn's injuries were not life-threatening. He contends that, as such, the evidence did not justify an inference that he intended to kill her. We disagree for two reasons.

¶ 72    First, and foremost, the evidence in this case includes a letter in which the defendant expressly admitted that he intended to kill Jessica Horn. This admission constitutes overwhelming evidence of his intent.

¶ 73    Second, as we have just discussed at length, all three cases relied on by the defendant involved circumstances in which defendants were armed with deadly weapons, but did not use those weapons in a deadly manner. In this case, by contrast, the defendant arrived at Horn's apartment unarmed, but he rummaged through her kitchen drawers looking for implements he could use as weapons. He then struck Horn in the head with an object while forcing his way into the bathroom, where she and Blake attempted to take refuge. Once he gained entry, the defendant stabbed Blake to death, and when the knife he used for this purpose broke, he wielded a barbecue fork against Horn and attempted to use it to stab her.

¶ 74    In essence, these circumstances are the opposite of what occurred in *Thomas*, *Jones*, and *Brown*. Unlike the defendants in those cases, the defendant in this case did not arrive at Horn's apartment with "the opportunity and means to kill" and decline to use the weapons at his disposal. See *Scott*, 271 Ill. App. 3d at 311. Rather, he arrived without the means to commit murder, but created the opportunity to kill by arming himself with objects found in Horn's home and wielding them in a deadly manner. These circumstances provide ample support for a reasonable inference that the defendant intended to kill Jessica Horn.

¶ 75    The defendant emphasizes, however, that, much like the defendant in *Brown*, he stopped attacking Horn even though she was not critically injured. He also emphasizes that he then walked away and left her with the ability to call for help. He argues that, as in *Brown*, these actions were inconsistent with an intent to kill. See *Brown*, 2015 IL App (1st) 131873, ¶ 10. We are not persuaded. As we discussed earlier, the defendant explicitly stated in his letter to his mother that the only reason he did not kill Horn was her admonition to think about their daughter. His actions after Horn convinced him to change his mind do not negate his intent prior to that moment.

¶ 76    The defendant also focuses on the fact that the charging instrument alleged that he committed the offense of attempted first-degree murder by striking Horn in the head with the intent to kill her. He posits that, even if the evidence was sufficient to demonstrate that he had the intent to kill her when he attempted to stab her with the barbecue fork, the evidence did not establish that he had that intent when he struck her in the head. We do not find this argument persuasive.

¶ 77    As we discussed earlier, the evidence shows that the defendant struck Horn in the head while he was attempting to force his way into the bathroom. He argues that at that point in time, he had no way to know who was standing behind the door. The defendant also points to the statement in his letter to his mother in which he admitted that he intended to kill Horn when he picked up the barbecue fork. He argues that this admission does not apply to the time, just minutes earlier, when he used an object to force his way into the bathroom.

33

¶ 78    The State, by contrast, argues that the defendant took a "substantial step" towards murdering Horn by engaging in a "relentless pursuit" of her—including his efforts to force his way into the bathroom, during which he struck her in the head with an object. The State further argues that the evidence is sufficient to prove that he specifically intended to kill Horn from the moment he saw her engaging in sex with Blake until the moment she convinced him to think about their daughter. We agree with the State.

¶ 79    The defendant's actions—breaking into Horn's apartment, finding multiple items he could use as weapons, stabbing Blake, and attempting to stab Horn—formed one continuous course of conduct. It is true that the defendant did not specifically state that he intended to kill Horn from the moment he saw her engaging in sex with Blake. However, we believe the evidence as a whole provides more than adequate support for the jury's conclusion that he did intend to kill Horn throughout the entire course of conduct at issue.

¶ 80    We reach this conclusion for two reasons. First, the evidence that the defendant found multiple items to use as weapons strongly supports an inference that he intended to kill both Blake and Horn all along. Second, the defendant's argument to the contrary essentially asks us to infer from the evidence that although he intended to kill Blake throughout the entire course of conduct, he only developed the intent to kill Horn after he killed Blake. We do not believe this is a reasonable inference.

¶ 81    Moreover, our role is to determine whether the evidence is sufficient to support the reasonable inferences drawn by the jury, as finder of fact. See *Brown*, 2015 IL App (1st) 131873, ¶ 12. We find that it is. Indeed, we believe the evidence overwhelmingly supports the jury's conclusion that the defendant intended to kill Horn throughout the encounter.

The evidence is therefore sufficient to support his conviction for attempted first-degree murder.

¶ 82   Finally, as an alternative to his argument concerning the sufficiency of the evidence, the defendant argues that the court erred by failing to instruct the jury that a defendant commits attempted first-degree murder only if he has the intent to kill a specific individual—in this case, Jessica Horn. He acknowledges that defense counsel did not request such an instruction, thus forfeiting appellate review of this issue. See *People v. Anderson*, 2012 IL App (1st) 103288, ¶ 43. However, he urges us to review his claim under the plain error doctrine or as ineffective assistance of counsel. We agree with the defendant that the instruction given was erroneous under the facts of this case. However, we do not believe it rises to the level of plain error, and we do not believe he can demonstrate that he was prejudiced by counsel's failure to request the instruction.

¶ 83   The purpose of jury instructions is to convey to the jurors the principles of law applicable to the evidence presented. *Id.* ¶ 57. Whether jury instructions clearly and correctly convey the applicable law "depends on whether 'ordinary persons acting as jurors would fail to understand them.' " *Id.* (quoting *People v. Herron*, 215 Ill. 2d 167, 187-88 (2005)). Generally, we review a trial court's decision to give or refuse a particular jury instruction for an abuse of discretion. *Id.* ¶ 33. However, we review *de novo* the question of whether the instructions given accurately state the applicable law. *Id.* ¶ 34.

¶ 84   Here, the jury was instructed that "[a] person commits the offense of attempt first-degree murder when he, with the intent to kill an individual, does any act which constitutes a substantial step toward the killing of an individual." See Illinois Pattern Jury Instructions,

35

Criminal, No. 6.05X (4th ed. 2000) (IPI Criminal). The jury was further instructed as follows:

> "To sustain the charge of attempt first-degree murder, the State must prove the following propositions.
>
> First proposition: That the defendant performed an act which constituted a substantial step toward the killing of an individual; and
>
> Second proposition: That the defendant did so with the intent to kill an individual." See IPI Criminal No. 6.07X.

These instructions were based on Illinois pattern jury instructions. Pattern instructions are generally appropriate because they were " 'painstakingly drafted' " to accurately reflect the law. *Anderson*, 2012 IL App (1st) 103288, ¶ 40 (quoting *People v. Durr*, 215 Ill. 2d 283, 301 (2005)). However, courts may deviate from pattern instructions when necessary "in order to conform to the facts of the case." *Id*. ¶ 61. The defendant argues that it was necessary to do so in this case, and we agree.

¶ 85    To support a conviction for attempted first-degree murder, it is not enough for the State to prove that the defendant acted with the intent to kill *any* individual; rather, the State must prove that he acted with the specific intent to kill the individual named in the charging instrument. See *Brown*, 2015 IL App (1st) 131873, ¶ 14. In cases involving conduct against more than one victim, Illinois courts have found that the otherwise appropriate pattern instructions have the potential to confuse jurors. This is because in such cases, the instructions do not make it clear that the subject of an attempted first-degree murder charge is one specific individual and only that individual. See *Anderson*, 2012 IL

36

App (1st) 103288, ¶ 61. All that is necessary to avoid this potential confusion is to inform jurors that they must find that the defendant intended to kill a specific individual—here, Jessica Horn. See *id*. The trial court erred in this case by not doing so.

¶ 86   As the defendant acknowledges, however, counsel did not request a modified instruction or raise the error before the trial court. As such, he has forfeited review of this issue. *Id*. ¶ 43. He urges us to consider his claim under the plain error doctrine. Under that doctrine, we may consider an issue that has been forfeited if (1) the evidence is so closely balanced that the error may have been enough to tip the scales of justice against the defendant, or (2) the error was serious enough to affect the fairness of the defendant's trial and undermine the integrity of the judicial process. *Id*. ¶ 44. The defendant argues that both prongs of this test are satisfied. We disagree.

¶ 87   We first observe that, as we discussed at length earlier, the evidence that the defendant intended to kill Jessica Horn was overwhelming; it was not closely balanced. We thus find that the closely-balanced prong of the plain error test is not satisfied.

¶ 88   We likewise find that the error was not so serious that it undermined either the fairness of the defendant's trial or the integrity of the judicial process. We recognize that giving the jury instructions that fail to inform jurors of all the elements of the offenses charged is an error so fundamental that it often warrants review under the serious-error prong of the plain error test. See, *e.g.*, *People v. Fonder*, 2013 IL App (3d) 120178, ¶ 25; *People v. Hale*, 2012 IL App (4th) 100949, ¶¶ 23-25 (called into question on other grounds by *People v. Goodwin*, 2017 IL App (5th) 140432, ¶ 19). We likewise recognize that the jury found it necessary to ask for clarification on this very point in its first note to the court.

However, we believe that, contrary to the defendant's contentions, the jury's second note to the court demonstrates that the court's response to its first note cleared up any confusion before jurors reached a verdict on the attempt charge.

¶ 89   As we discussed earlier, the court responded to the first note by telling jurors that "The defendant can only be convicted of the attempt first-degree murder of Jessica Horn." The defendant argues that this response was inadequate to clear up any confusion. He further asserts that the court exacerbated the problem by telling jurors that they could consider any evidence in the record in reaching their verdict. He argues that this implied that jurors could consider his intent towards Shaun Blake. We find, however, that the second jury note, which requested the defendant's letters, demonstrates that jurors did, in fact, understand that they were required to find that the defendant specifically intended to kill Horn in order to return a verdict of guilty on the attempt charge. As stated previously, that note explained that jurors wanted to see the letters to aid them in their "review of attempt with intent." The letter to the defendant's mother expressly addresses his intent to kill Horn; neither letter discusses the defendant's intent with respect to his assault on Blake. Thus, jurors asked to review the evidence that addressed the precise issue before them— whether the defendant intended to kill Jessica Horn. On this record, it is clear that they understood what they were required to determine.

¶ 90   The defendant also urges us to consider counsel's failure to ask for a modified instruction as an additional claim of ineffective assistance of counsel. As we have already explained, however, a defendant cannot prevail on a claim of ineffective assistance of counsel unless he can demonstrate that but for counsel's error, there is a reasonable

probability of a more favorable result. In the face of the overwhelming evidence that the defendant intended to kill Jessica Horn during the entire assault, he cannot make this showing. His claim therefore fails.

¶ 91    For these reasons, we affirm the defendant's convictions.

¶ 92    Affirmed.